# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### NORTHERN DIVISION

JOHN DOES 1, 2, 4, 5, 6 & 8;  MICHAEL
ROBINSON;  and MAURICE COLLINS                          PLAINTIFFS

v.                          No. 3:23-cv-230-DPM

EMMETT A. PRESLEY, *et al.*                              DEFENDANTS

JOHN DOES 9–12 & 14–16;  and
NATHAN HARMON                                            PLAINTIFFS

v.                          No. 3:24-cv-3-DPM

EMMETT A. PRESLEY, *et al.*                              DEFENDANTS

JOHN DOES 19-25, 27-30                                   PLAINTIFFS

v.                          No. 3:24-cv-12-DPM

EMMETT A. PRESLEY, *et al.*                              DEFENDANTS

JOHN DOES 101–107;  and
JANE DOES 101–107                                        PLAINTIFFS

v.                          No. 3:24-cv-14-DPM

EMMETT A. PRESLEY, *et al.*                              DEFENDANTS

JOHN DOES 108–113;
JANE DOE 109;  and JAMI WELLS                            PLAINTIFFS

v.                          No. 3:24-cv-13-DPM

EMMETT A. PRESLEY, *et al.*                              DEFENDANTS

**THIRD AMENDED CONSOLIDATED COMPLAINT**

NOW COME Plaintiffs, by and through their attorneys, GILLISPIE LAW FIRM, ROMANUCCI & BLANDIN, LLC, STINAR GOULD GRIECO & HENSLEY, PLLC, PAUL BYRD LAW FIRM, PLLC, ONDER LAW, LLC, and ETOCH LAW FIRM, and for their Consolidated Complaint against Defendants EMMETT A. PRESLEY; TED E. SUHL, individually and d/b/a MAXUS, INC. d/b/a ARKANSAS COUNSELING ASSOCIATES INCORPORATED d/b/a TRINITY BEHAVIORAL HEALTHCARE SYSTEMS, INC. d/b/a THE LORD'S RANCH; MAXUS, INC., individually and d/b/a THE LORD'S RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH; THE LORD'S RANCH CHRISTIAN BOY'S HOME, INC.; THE LORD'S RANCH CHRISTIAN CENTER AND CHILDREN'S REHABILITATION UNIT; THE LORD'S RANCH PSYCHIATRIC UNIT, INC.; CHRISTIAN INTERNATIONAL MEDICAL SCIENCES FOUNDATION, INC.; CORNERSTONE TREATMENT CENTER, INC.; BURKLYN CORPORATION; GOOD SAMARITAN REHABILITATION CENTER, INC.; WARM SPRINGS CHRISTIAN CENTER, INC.; TRINITY DYNAMICS, INCORPORATED; THE LORD'S RANCH BEHAVIORAL HEALTHCARE SYSTEM, INCORPORATED; TRIENNIA HEALTH CARE, INC.; HORIZON SUNRISE MANAGEMENT; MILLENIA HEALTH CARE, INC.; LG PROPERTY MANAGEMENT, INCORPORATED; GREEN VALLEY ASSET MANAGEMENT, LLC; ROLLING HILLS INVESTMENTS, LLC; REGAL PROPERTY DEVELOPMENT LLC; SHIRLEY SUHL; ALONZA JILES; TYREE DAVIS; and JOHN DOE DEFENDANTS 1–10, hereby state as follows:

**INTRODUCTION**

1.    From its founding in 1976 until its closing in 2016, The Lord's Ranch, by and owners, officers, administrators, operators, agents, and/or employees, allowed and covered up a

1

pervasive institutional culture of psychological, physical, and sexual abuse directed against children.

2.      Plaintiffs in this consolidated cause are survivors of the predations of The Lord's Ranch's owners, officers, administrators, operators, agents, employees and/or those of its associated entities, predecessor entities, and/or successor entities (collectively, "TLR").

3.      Plaintiffs bring this cause under Arkansas state law and federal law, seeking compensation for the devastating damages that TLR's acts and omissions caused, for negligence, and for punitive damages seeking to deter other facilities from engaging in similarly shocking and reprehensible conduct.

## PARTIES, JURISDICTION, AND VENUE

### A.  Plaintiffs

4.      While the plaintiffs in this cause include male and female survivors, for purposes of simplicity the designation "John Doe" is used herein regardless of gender.

5.      Plaintiff **John Doe 1** is an adult male resident of the State of Oklahoma. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 1 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 1 was a resident of The Lord's Ranch facilities at Warm Springs, Arkansas (hereinafter The Lord Ranch Entities'

primary place of business and surrounding facilities located at and around 1033 Old Burr Road, Warm Springs, AR shall be designated as "The Ranch").

6.      Plaintiff **John Doe 2** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 2 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 2 was a resident of The Ranch.

7.      Plaintiff **MICHAEL ROBINSON** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Michael Robinson was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, Michael Robinson was a resident of The Ranch.

8.      Plaintiff **John Doe 4** is an adult male resident of the State of Florida. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 4 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 4 was a resident of The Ranch.

9.      Plaintiff **John Doe 5** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 5 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 5 was a resident of The Ranch.

10.      Plaintiff **John Doe 6** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 6 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 6 was a resident of The Ranch.

11.      Plaintiff **MAURICE COLLINS** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Maurice Collins was an

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, Maurice Collins was a resident of The Ranch.

12.     Plaintiff **John Doe 8** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 8 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 8 was a resident of The Ranch.

13.     Plaintiff **John Doe 9** is an adult male resident of the District of Columbia. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 9 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 9 was a resident of The Ranch.

14.     Plaintiff **John Doe 10** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 10 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 10 was a resident of The Ranch.

15.     Plaintiff **John Doe 11** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 11 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 11 was a resident of The Ranch.

16.     Plaintiff **John Doe 12** is an adult male resident of the State of Wisconsin. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 12 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 12 was a resident of The Ranch.

17.     Plaintiff **NATHAN HARMON** is an adult male resident of the State of Indiana. At all times relevant to the tortious conduct alleged in this Complaint, Nathan Harmon was an

4

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe13 was a resident of The Ranch.

18.     Plaintiff **John Doe 14** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe14 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 14 was a resident of The Ranch.

19.     Plaintiff **John Doe 15** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe15 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 15 was a resident of The Ranch.

20.     Plaintiff **John Doe 16** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 16 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 16 was a resident of The Ranch.

21.     Plaintiff **John Doe 19** is an adult male resident of the State of Texas. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 19 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 19 was a resident of The Ranch.

22.     Plaintiff **John Doe 20** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 20 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 20 was a resident of The Ranch.

23.     Plaintiff **John Doe 21** is an adult male resident of the State of Tennessee. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 21 was an

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 21 was a resident of The Ranch.

24.     Plaintiff **John Doe 22** is an adult female resident of the State of Indiana. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 22 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 22 was a resident of The Ranch.

25.     Plaintiff **John Doe 23** is an adult male resident of the State of Alaska. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 23 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 23 was a resident of The Ranch.

26.     Plaintiff **John Doe 24** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 24 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 24 was a resident of The Ranch.

27.     Plaintiff **John Doe 25** is an adult female resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 25 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 25 was a resident of The Ranch.

28.     Plaintiff **John Doe 26** is an adult male resident of the State of Florida. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 26 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 26 was a resident of The Ranch.

29.     Plaintiff **John Doe 27** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 27 was an unemancipated

minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 27 was a resident of The Ranch.

30.     Plaintiff **John Doe 28** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 28 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 28 was a resident of The Ranch.

31.     Plaintiff **John Doe 29** is an adult female resident of the State of Alaska. At all times relevant to the tortious conduct alleged in this Complaint, John Doe 29 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action, John Doe 29 was a resident of The Ranch.

32.     Plaintiff **John Doe 30** is an adult male resident of the State of Washington. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action,

Plaintiff was a resident of The Ranch.

33.     Plaintiff **John Doe 101** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 102 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 101 was a resident of The Ranch.

34.     Plaintiff **John Doe 102** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 102 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 102 was a resident of The Ranch.

35.     Plaintiff **John Doe 103** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 104 was an

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 103 was a resident of The Ranch.

36.    Plaintiff **John Doe 104** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 104 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 104 was a resident of The Ranch.

37.    Plaintiff **John Doe 105** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 105 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 105 was a resident of The Ranch.

38.    Plaintiff **John Doe 106** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 106 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 106 was a resident of The Ranch.

39.    Plaintiff **John Doe 107** is an adult male resident of the State of New Mexico. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 107 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 107 was a resident of The Ranch.

40.    Plaintiff **John Doe 108** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 108 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 108 was a resident of The Ranch.

41.    Plaintiff **John Doe 109** is an adult male resident of the State of Idaho. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 109 was an

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 109 was a resident of The Ranch.

42.    Plaintiff **John Doe 110** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 110 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 110 was a resident of The Ranch.

43.    Plaintiff **John Doe 111** is an adult male resident of the State of Indiana. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 111 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 111 was a resident of The Ranch.

44.    Plaintiff **John Doe 112** is an adult male resident of the State of Illinois. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 112 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 112 was a resident of The Ranch.

45.    Plaintiff **John Doe 113** is an adult male resident of the State of Oklahoma. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff John Doe 113 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff John Doe 113 was a resident of The Ranch.

46.    Plaintiff **Jane Doe 101** is an adult female resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 101 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 101 was a resident of The Ranch.

47.    Plaintiff **Jane Doe 102** is an adult female resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 102 was an

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 102 was a resident of The Ranch.

48.    Plaintiff **Jane Doe 103** is an adult female resident of the State of Oklahoma. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 103 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 103 was a resident of The Ranch.

49.    Plaintiff **Jane Doe 104** is an adult female resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 104 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 104 was a resident of The Ranch.

50.    Plaintiff **Jane Doe 105** is an adult female resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 105 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 105 was a resident of The Ranch.

51.    Plaintiff **Jane Doe 106** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 106 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 106 was a resident of the Lord's Ranch.

52.    Plaintiff **Jane Doe 107** is an adult male resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 107 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 107 was a resident of the Lord's Ranch.

53.    Plaintiff **JAMIE WELLS** is an adult female resident of the State of Arkansas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 108 was an

unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 108 was a resident of the Lord's Ranch.

54.    Plaintiff **Jane Doe 109** is an adult female resident of the State of Texas. At all times relevant to the tortious conduct alleged in this Complaint, Plaintiff Jane Doe 108 was an unemancipated minor residing in Warm Springs, Arkansas. At all times relevant to this action Plaintiff Jane Doe 108 was a resident of the Lord's Ranch.

## B.  The Lord's Ranch Defendants

55.    Bud and Shirley Suhl founded The Lord's Ranch in 1976.

56.    In 1987, the Arkansas Department of Human Services licensed The Lord's Ranch as a Residential Childcare Facility.

57.    At all relevant times, The Lord's Ranch served and held itself out to the public as a residential treatment center for children and adolescents, 6 to 17 years old.

58.    At all relevant times, The Lord's Ranch was based out of The Ranch, comprising over 1,100 acres.  See *e.g., Figure 1* below.



*Figure 1*

59.    At all relevant times, The Lord's Ranch and its associated entities, predecessor entities, and successor entities, including the entities identified below, all shared the same principal place of business; all shared the same owners and key managerial employees; and all did business

as "The Lord's Ranch."

60.     In or around 1984, **The Lord's Ranch Christian Boy's Home, Inc.** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. The Lord's Ranch Christian Boy's Home, Inc.'s registered agent was Shirley Suhl, whose registered agent address was at 1033 Old Burr Road, Warm Springs, Arkansas 72478.

61.     Prior to The Lord's Ranch Christian Boy's Home, Inc.'s dissolving, it had identified the following Officers with the Arkansas Secretary of State: Shirley Suhl, Director; Allied West Consulting LLC, Director; Western Sky Managers LLC, Director.

62.     In or around 1990, **Good Samaritan Rehabilitation Center, Inc.** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Good Samaritan Rehabilitation Center, Inc.'s registered agent was Ted Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Good Samaritan Rehabilitation Center, Inc.'s charter has since been forfeited.

63.     In or around 1994, **Christian International Medical Sciences Foundation, Inc.** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Christian International Medical Sciences Foundation, Inc.'s registered agent was Ted Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Christian International Medical Sciences Foundation, Inc., has, upon information and belief, since been statutorily dissolved.

64.     In or around 1995, **The Lord's Ranch Christian Center and Children's Rehabilitation Unit** was incorporated as a non-profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. The

Lord's Ranch Christian Center and Children's Rehabilitation Unit's registered agent was Bud Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. The Lord's Ranch Christian Center and Children's Rehabilitation Unit was eventually statutorily dissolved, upon information and belief.

65.    In or around 1995, **Defendant Warm Springs Christian Center, Inc.** was incorporated and still is incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Defendant Warm Springs Christian Center, Inc.'s registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. At all relevant times until present, Defendant Warm Springs Christian Center, Inc. identifies the following Officers with the Arkansas Secretary of State: Ted E. Suhl, President.

66.    In or around 1999, and at all relevant times, **Defendant Maxus, Inc.**, individually and doing business at times as **Arkansas Counseling Associates**, was incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. At all relevant times until present, Defendant Maxus, Inc.'s President was and is Ted. E. Suhl.

67.    At all relevant times, Defendant Maxus, Inc. was a licensed provider of mental health counseling to juvenile patients within the state of Arkansas, including in-patient and outpatient clinics.

68.    Defendant Maxus, Inc. operated 18 outpatient counseling clinics throughout Arkansas and during the relevant time period, was a provider of Medicaid services.

69.    Defendant Maxus, Inc.'s current principal place of business is, upon information and belief, Little Rock, Arkansas. Defendant Maxus, Inc. may be served with process in this action by delivering summons and a copy of this Complaint to its registered agent, C T Corporation

System, located at 124 West Capitol Avenue, Suite 1900, Little Rock, Arkansas 72201.

70.    In or around 2001, **The Lord's Ranch Psychiatric Unit, Inc.** was incorporated as a For Profit Corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. The Lord's Ranch Psychiatric Unit, Inc.'s registered agent was Ted E. Suhl, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478.

71.    The Lord's Ranch Psychiatric Unit, Inc. has since, upon information and belief, forfeited its charter and is no longer an active corporation. Prior to The Lord's Ranch Psychiatric Unit, Inc.'s charter being forfeited, it had identified the following Officers with the Arkansas Secretary of State: Shirley Suhl, Secretary; Shirley Suhl, Treasurer; and Ted E. Suhl, President.

72.    In or around 2005, **Trinity Behavioral Health Care System, Incorporated** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Trinity Behavioral Health Care System, Incorporated's registered agent was Joel P. Landreneau, whose registered agent address was at 1033 Old Burr Road, Warm Springs, Arkansas 72478.

73.    Prior to Trinity Behavioral Health Care System, Incorporated dissolving, it had identified the following Officers with the Arkansas Secretary of State: Ted E. Suhl, Incorporator/Organizer and President; Shirley A. Suhl, Secretary; and Shirley A. Suhl, Treasurer.

74.    At all relevant times, Trinity Behavioral Health Care System, Incorporated was a licensed Psychiatric Residential Treatment facility that regularly treated approximately 100 inpatient juvenile psychiatric patients ranging in age from 6 to 17. Trinity was licensed by the Arkansas Department of Human Services and was a qualified provider of Medicaid services.

75.    In or around 2006, **Cornerstone Treatment Center, Inc.** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033

Old Burr Road, Warm Springs, Arkansas 72478. Cornerstone Treatment Center, Inc. registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Cornerstone Treatment Center, Inc.'s charter was eventually forfeited.

76.    Prior to its charter being forfeited, Cornerstone Treatment Center, Inc. had identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

77.    In or around 2007, **Defendant Trinity Dynamics, Incorporated** was incorporated and still is incorporated as a For Profit Business in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Defendant Trinity Dynamics, Incorporated's registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478.

78.    Defendant Trinity Dynamics, Incorporated identifies the following Officers with the Arkansas Secretary of State: Ted E. Suhl, President.

79.    In or around 2007, **LG Property Management, Incorporated** was incorporated as a For Profit corporation in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. LG Property Management, Incorporated's registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. LG Property Management, Incorporated was eventually dissolved.

80.    In or around 2007, **Defendant Green Valley Asset Management, LLC** was incorporated and still is incorporated as an LLC in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Green Valley Asset Management, LLC registered agent was Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Green Valley Asset Management, LLC

identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

81.    In or around 2007, **Rolling Hills Investments, LLC** was incorporated and still is incorporated as an LLC in the State of Arkansas, with a principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas 72478. Rolling Hills Investments, LLC's registered agent is Joel P. Landreneau, whose registered agent address was 1033 Old Burr Road, Warm Springs, Arkansas 72478. Rolling Hills Investments, LLC identified the following Officer with the Arkansas Secretary of State: Joel P. Landreneau, Incorporator/Organizer.

82.    At all relevant times, the Suhl Family owned and operated The Lord's Ranch and all its associated entities, predecessor companies, and successor companies, including without limitation Defendants Maxus, Inc.; The Lord's Ranch Christian Boy's Home, Inc.; Good Samaritan Rehabilitation Center, Inc.; Christian International Medical Sciences Foundation, Inc.; The Lord's Ranch Christian Center and Children's Rehabilitation Unit; Warm Springs Christian Center, Inc.; The Lord's Ranch Psychiatric Unit, Inc.; Christian International Medical Sciences Foundation, Inc.; Warm Springs Christian Center, Inc.; Trinity Behavioral Health Care System, Incorporated; Cornerstone Treatment Center, Inc.; Trinity Dynamics, Incorporated; LG Property Management, Incorporated; Green Valley Asset Management, LLC; and Rolling Hills Investments, LLC (collectively, "The Lord's Ranch Entities" or "TLRE").

83.    At all relevant times, TLRE did business as "The Lord's Ranch" or as "Trinity Behavioral Health" with their primary place of business located at The Ranch.

84.    At all relevant times, TLRE operated as if they were one single entity.

85.    The TLRE shared the    same    website,    www.lordsranch.com;    and    later www.trinityhealthcareusa.com.

86.    At all relevant times, **Defendant Theodore "Ted" E. Suhl** was an owner and

16

senior Director of TLRE and The Ranch.

87.     Ted Suhl served as The Lord's Ranch's Executive Director and previously served as its Deputy Director under his father, Bud Suhl.

88.     Upon information and belief, Ted Suhl is a resident of Jonesboro, Craighead County, Arkansas.

89.     At all relevant times, **Defendant Shirley Suhl** was an owner and senior Director of TLRE and facilities, including The Ranch, serving as an Administrative Director, among other senior positions.

90.     Upon information and belief, Shirley Suhl is a resident of Jonesboro, Craighead County, Arkansas.

91.     At all relevant times, **Defendant Emmett A. Presley,** MSWAC, LCSW, ACSW, QCSW, DCSW, served as the Director of Social Services for TLRE and The Ranch.

92.     At all relevant times, Emmett Presley's responsibilities at The Lord's Ranch included providing counseling to residents, coordinating social work services, preparing diagnostic summaries, developing and reviewing service plans, and providing other therapeutic treatment services.

93.     At all relevant times, Emmett Presley was a full-time administrative staff member at The Lord's Ranch.

94.     Upon information and belief, Emmett Presley is a resident of Jonesboro, Craighead County, Arkansas, and he may be served with process at 4208 Sandra Cove, Jonesboro, Arkansas 72405.

95.     At all relevant times, **Defendant Alonza Jiles** served as a senior Director of TLRE and The Ranch as the Deputy Administrator at The Lord's Ranch.

96.     Upon information and belief, Alonza Jiles is a resident of Paragould, Greene

County, Arkansas.

97.    At all relevant times, **Defendant Tyree Davis** was an employee of the Lord's Ranch Entities and facilities including its primary facility located in Warm Springs, AR.

98.    Various individuals and entities not named as defendants herein**, John Doe Defendants 1-10**, may have directly participated in the tortious conduct alleged herein, may have performed acts and made statements in furtherance thereof, or omissions, which contributed to or caused the tortious acts and resulting damages outlined in this Complaint. These various individuals and entities may be, without limitation, employees, agents, affiliates, alter-egos, partners, joint-ventures, parent organizations, subsidiaries, or insurance carriers of the named defendants. Each of the John Doe unknown tortfeasors may have performed each of the acts alleged herein, or alternatively, each of the John Doe unknown tortfeasors may have authorized or ordered duly authorized officers, agents, employees, or representatives to perform said acts. These tortfeasors, upon information and belief, committed tortious acts or permitted tortious acts to be committed in Arkansas.

99.    To the extent that such John Doe tortfeasors are liable for some or all of plaintiffs' damages, the identity of said tortfeasors has not been determined as of this date and it is necessary to conduct discovery to determine the identity of said tortfeasors. Pursuant to Ark. Code Ann. § 16-56-125, Plaintiff has attached as *Exhibit 1* an Affidavit which is incorporated herein by reference to toll the statute of limitations for the wrongful actions and/or omissions alleged herein against the John Does 1-10. If a John Doe Tortfeasor is identified for one or more of the causes of action listed below, Plaintiffs will amend this Complaint in accordance with Ark. Code Ann. § 16-56-125.

100.    Hereinafter, TLRE, Ted Suhl, Shirley Suhl, Alonza Jiles, Emmett Presley, Tyree Davis, and John Doe Defendants will collectively be referred to as "**The Lord's Ranch**

**Defendants**."

## JURISDICTION & VENUE

101.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

102.    At all relevant times, defendants received federal financial assistance within the meaning of 20 U.S.C. § 1681(a) and are subject to Title IX, and plaintiffs have brought claims under Title IX.

103.    This Court has subject matter jurisdiction over plaintiffs' federal claims under 28 U.S.C. §§ 1331 and 1367, because the claim involves questions arising under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-88 ("Title IX").

104.    Moreover, plaintiffs have brought claims under 18 U.S.C. § 1595(a), the Trafficking Victims Protection Reauthorization Act ("TVPRA").

105.    This Court has supplemental jurisdiction over plaintiffs' state law causes of action, including but not limited to claims for negligence, assault, and battery, pursuant to 28 U.S.C. § 1367(a), because they are so related to the federal claims that they form part of the same case or controversy.

106.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## STATUTE OF LIMITATIONS

107.    Plaintiffs' claims are timely under the Justice for Vulnerable Victims of Sexual Abuse Act, codified at Ark. Code Ann. § 16-118-118. Pursuant to this newly enacted law, "a cause of action arising before, on, or after July 28, 2021, that was barred or dismissed due to a statute of limitation, is revived, and the civil action may be commenced not earlier than six (6) months after and not later than thirty (30) months after July 28, 2021."

108.    Alternatively, many Plaintiffs' claims are timely pursuant to the Arkansas delayed discovery statute, codified at Ark. Code Ann. § 16-56-130 (referred to herein as "Delayed Discovery Act"). The Delayed Discovery Act provides a victim of childhood sexual abuse three years to bring suit from when the victim "discovers the *effect* of the injury or condition attributable to the childhood sexual abuse" [emphasis added]. The Act is potentially applicable to any victim of childhood sexual abuse who had not yet reached the age of 21 on August 13, 1993, the Act's effective date.

109.    Plaintiff **John Doe 1's** claims are timely under the Delayed Discovery Act as follows:

A.  Plaintiff was born in 1983. Plaintiff was abused between approximately 1997 and 2000, while Plaintiff was approximately 13 to 17 years old.

B.  Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or

from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to sexual dysfunction, intimacy issues, difficulty maintaining relationships, drug abuse, shame, low self-esteem, impulse control, incarceration, as well as poverty and homelessness.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**G.** Plaintiff was in and out of prison for much of his adult life, mostly for offenses related to his long-term drug abuse.

**H.** Plaintiff lacks formal education, having not even graduated from high school. He lacks a basic understanding of psychology.

**I.** Prior to approximately 2022, Plaintiff spent his adult life trying to forget that the abuse ever happened and to avoid the memories altogether, as a way to survive. Plaintiff did not have the luxury of being able to devote time and energy to psychological self-discovery. He always preoccupied with much more basic and immediate concerns that come with extreme poverty, such as trying to feed, clothe, and house himself.

**J.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury. For instance, Plaintiff's mother and stepfather physical abused him as a child. He recalls his mother putting cigarettes out on his body when he was a young child.

**K.** Plaintiff has never been afforded any counseling or therapy related to the childhood sexual abuse he experienced at the hands of Presley.

**L.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**M.** In 2022, upon release from approximately four years of prison in Oklahoma, Plaintiff began to try to clean his life up and stay away from drugs and other illegal activities. He was living at a halfway house-type place called Under God's Care, in Spiro, OK, where he was assigned a case manager. It was there, while sober and with the help of his assigned case manager, that he began to reflect on his life, including the reasons for his problems. And it was only then that he began to identify Presley's sexual molestations of him as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to begin to recognize the effects of those injuries.

**N.** And then shortly thereafter he discovered and listened to a podcast about the Lord's Ranch's abuses of children, which also bolstered his discovery process.

**O.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

110.    Plaintiff **John Doe 2's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1975. Plaintiff was abused between approximately 1991 and 1995, while Plaintiff was approximately 15 to 18 years old.

**B.** Not until 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, sexual dysfunction, intimacy issues, and post-traumatic stress disorder. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to sexual dysfunction, drug use, intimacy issues, difficulty maintaining relationships, shame, low self-esteem, impulse control, hypervigilance, trust issues, and poverty.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff has only minimal education and little to no understanding of psychology.

**H.** Plaintiff had a difficult childhood that was rife with poverty and dysfunction. He grew up around gang violence. His traumatic childhood, prior to the Lord's Ranch, made opaquer the source of the effects of the injuries caused by Presley's molestations of him as a minor at the Lord's Ranch.

23

**I.** Plaintiff has never received any therapy or counseling of any kind.

**J.** Plaintiff intentionally tried to forget about the abuse, and he lived in fear of others finding out what Presley had done to him, so he buried the memories and avoided them until 2023.

**K.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**L.** In 2023, Plaintiff learned of a podcast about the Lord's Ranch. It was this podcast and listening to the accounts of others victimized the Lord's Ranch that finally caused Plaintiff to force himself to reflect on his own abuse by Presley and to begin making connections to problems in his life.

**M.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

111.    Plaintiff **Michael Robinson's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1982. Plaintiff was abused between approximately 1999 and 2002, while Plaintiff was approximately 16 to 18 years old.

**B.** Not until 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff,

psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to drug abuse, sexual dysfunction, intimacy issues, difficulty maintaining relationships, crippling anxiety, hypervigilance, social isolation, fear of leaving his home, shame, low self-esteem, poverty, impulse control, and incarceration.

**F.** Plaintiff also suffers from obsessive-compulsive disorder (OCD), which likely is not related to the sexual abuse, but which also contributed to preventing Plaintiff from recognizing the connections between the effects of his psychological injuries and the abuse by Presley. OCD causes a sufferer to become preoccupied with irrational obsessions, often to the exclusion of more relevant or immediate concerns. A sufferer often has much less control over the priorities of his conscious mind and can spend a lifetime "missing the forest for the trees," to borrow the old idiom.

**G.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

25

**H.** Plaintiff was also incarcerated for much of his adult life, between approximately 2007 and 2021, which also made it more difficult and less likely for him to discovery the effects of any conditions caused by sexual abuse.

**I.** Additionally, he never wanted to remember the abuse and he actively tried to avoid thinking about it.

**J.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury. For instance, Plaintiff's father subjected him to physical and emotional abuse as a young child.

**K.** Plaintiff has never received any therapy or counseling for the childhood sexual abuse he experienced at the hands of Presley, nor has he ever disclosed that he was abused to any treatment provider of any kind.

**L.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**M.** In 2023, Plaintiff learned of a podcast about the Lord's Ranch. It was this podcast and listening to the accounts of others at the Lord's Ranch that finally caused Plaintiff to force himself to reflect on his own abuse by Presley and to begin making connections to problems in his adult life. It brought his own abuse front and center in his conscious mind for the first time ever.

**N.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the

childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

112.    Plaintiff **John Doe 4's** claims are timely under the Delayed Discovery Act as follows:

A.  Plaintiff was born in 1985. Plaintiff was abused between approximately 1996 and 2001, while Plaintiff was approximately 10 to 16 years old.

B.  Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse.

D.  Unbeknownst to Plaintiff, some of the very psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

E.  These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder (PTSD). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

F.  The effects of the conditions may include but are not limited to intimacy issues, difficulty maintaining relationships, anger, low self-esteem, shame, hypervigilance, and trust issues.

27

**G.** Plaintiff also suffers from bi-polar disorder, which may not be related to the Presley abuse, but which is also a condition that contributed to Plaintiff's inability to make the discovery prior to when he did.

**H.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**I.** Plaintiff was diagnosed by a medical doctor with PTSD in approximately 2022. This medical doctor was not a psychiatrist or mental health professional.

**J.** It was in approximately 2022 that Plaintiff began, for the first time, to connect the effects of the conditions caused by the abuse to the abuse by Presley, including things such as his anger issues, his hypervigilance, and his low self-esteem.

**K.** Prior to approximately 2022, Plaintiff never received any therapy or counseling.

**L.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**M.** In approximately 2022, Plaintiff began delving into his abuse and his troubled childhood with a pastor at his church in Daytona, Florida, which has helped in his process of self-discovery. However, this pastor is not a mental health professional.

**N.** Before then, Plaintiff actively tried to suppress all memories of the abuse, much less allow himself to consider its impact on his life.

**O.** Plaintiff's discovery of the effects of the conditions caused by the sexual abuse at the hands of Presley was also bolstered by happening upon and listening to a podcast about the Lord's Ranch in approximately 2022 or 2023.

**P.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

113.    Plaintiff **John Doe 5's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1979. Plaintiff was abused between approximately 1994 and 1997, while Plaintiff was approximately 14 to 18 years old.

**B.** Despite having received some therapy in the 2010s, Plaintiff believes he did not comprehend the effects of the injuries or conditions attributable to the childhood sexual abuse committed specifically by Presley, as described herein, until at least 2021.

**C.** Psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), helped prevent a full discovery of the effects.

**D.** These conditions may include but are not limited to the following: depression, anxiety, and post-traumatic stress disorder. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to anger, sexual dysfunction, intimacy issues, difficulty maintaining relationships, anxiety, shame, low self-esteem, and poverty.

F.  Plaintiff spent the majority of his adult life trying to avoid the memories of Presley's abuse. Most of the time, he intentionally tried not to reflect on what Presley did to him and how it might have impacted him.

G.  Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury. For instance, Plaintiff was sexually abused as younger child by cousin, physically abused his stepfather, and suffered the loss of loved ones to gang violence.

H.  Plaintiff received some therapy from the Edward Hines VA Medical Facility in Hines, IL. Plaintiff believes that he disclosed having been sexually abused in therapy in approximately 2014. Plaintiff does not believe that it was addressed in depth.

I.  One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

J.  Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

114.  Plaintiff **John Doe 6's** claims are timely under the Delayed Discovery Act as follows:

A.  Plaintiff was born in 1984. Plaintiff was abused between approximately 2000 and 2003, while Plaintiff was approximately 15 to 18 years old.

30

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions potentially attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), contributed to preventing that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, substance abuse disorder(s), and gender dysphoria. The presence of any or all of these conditions can prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to shame, anger, intimacy issues, trust issues, difficulty maintaining relationships, low self-esteem, anxiety, poverty, homelessness, struggles related to sexuality, and depression.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**G.** Plaintiff has struggled with poverty and sometimes even homelessness for much of adult life. Plaintiff never had the opportunity to focus on self-discovery and psychological breakthrough, because Plaintiff had to continuously struggle to meet Plaintiff's basic needs, such as food and housing.

31

**H.** Prior to at least 2022, Plaintiff actively tried to forget about the sexual abuse by Presley as opposed to processing it.

**I.** Plaintiff has never received any counseling or therapy related to the childhood sexual abuse by Presley.

**J.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**K.** From approximately 2018 to 2022, Plaintiff lived in a homeless shelter in Chicago called Thresholds.

**L.** Not long after transitioning from the shelter to independent living in approximately 2022, Plaintiff discovered and listened to a podcast about the Lord's Ranch. There was also a Facebook page dedicated to Lord's Ranch victims, Plaintiff discovered. And at this point the memories of the abuse by Presley came flooding back and Plaintiff began to identify Presley's sexual molestations as a root cause of some of Plaintiff's struggles, which Plaintiff began to think of in terms of psychological injuries and was able to start to recognize the effects of those injuries.

**M.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

115.    Plaintiff **Maurice Collins's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1984. Plaintiff was abused between approximately 1999 and 2003, while Plaintiff was approximately 14 to 18 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions likely attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), contributed to preventing that discovery.

**D.** These conditions may include but are not limited to the following: depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to social anxiety, shame, low self-esteem, intimacy issues, sexual dysfunction, long-term drug abuse, chronic legal troubles and imprisonment due to illegal drug use, poverty, and relationship troubles.

**F.** Plaintiff also suffers from conditions likely unrelated to the sexual abuse, including schizophrenia and bipolar disorder, that also greatly contributed to his inability to make the discovery sooner. Schizophrenia is a chronic mental illness that affects thinking, feeling, and behavior. This alone, particularly in a sufferer who lacks financial resources to get treatment and is often incarcerated, reasonably prevented Plaintiff from ever having the mental clarity to make the discovery.

**G.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**H.** Plaintiff was in and out of prison for much of his adult life, mostly for offenses related to his long-term drug abuse.

**I.** Plaintiff lacks formal education, having not graduated from high school.

**J.** Prior to approximately 2022, Plaintiff spent his adult life trying to forget that the abuse ever happened and to avoid the memories altogether, as a way to survive (particularly in prison).

**K.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury. For instance, Plaintiff's mother physical abused him as a child. He recalls being in and out of psychiatric residential treatment facilities as a child prior to the Lord's Ranch.

**L.** Plaintiff has not received any counseling or therapy related to the childhood sexual abuse he experienced at the hands of Presley.

**M.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**N.** Plaintiff, in approximately 2022, after having been out of prison for nearly four years, learned of a podcast about the Lord's Ranch. There was also a Facebook page dedicated to Lord's Ranch victims, Plaintiff discovered. When he started listening and reviewing others' accounts, he lost the ability to repress the memories

of the abuse by Presley, and it all came flooding back, forcing Plaintiff to start to recognize Presley's sexual molestations as a root cause of some of Plaintiff's struggles, which Plaintiff began to think of in terms of psychological damage that has been detrimental to his adult life.

**O.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

116.    Plaintiff **John Doe 8's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1976. Plaintiff was abused between approximately 1991 and 1994, while Plaintiff was approximately 14 to 17 years old.

**B.** Not until at least 2021 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley) prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or

from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, and drug abuse.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**G.** Plaintiff tried to actively forget that the abuse ever happened and to avoid the memories altogether, as a way to survive.

**H.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**I.** Plaintiff has not received counseling or therapy specifically related to the childhood sexual abuse he experienced at the hands of Presley.

**J.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**K.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

117.    Plaintiff **John Doe 9's** education and work experience present a question as to whether his claims can be tolled by the Delayed Discovery Act:

    **A.** Plaintiff was born in 1986. Plaintiff was abused by Presley between approximately 2000 and 2003, while Plaintiff was approximately 13 to 17 years old.

    **B.** Plaintiff is a Licensed Clinical Social Worker, holds a master's degree in social work, and holds a PhD in Educational Leadership.

    **C.** Plaintiff has worked as a psychotherapist.

118.    Plaintiff **John Doe 10's** claims are timely under the Delayed Discovery act as follows:

    **A.** Plaintiff was born in 1978. Plaintiff was abused between approximately 1993 and 1996, while Plaintiff was approximately 15 to 18 years old.

    **B.** Not until 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

    **C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

    **D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to hypervigilance, shame, intimacy issues, anxiety, impulse control, anger, drug use, low self-esteem, and imprisonment.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff spent much of his early adult years in prison but has remained free since approximately 2003.

**H.** Since leaving the Lord's Ranch, Plaintiff has actively tried to suppress all memories of his sexual abuse at the hands of Presley. He believes he has not talked about it with anyone prior to this case.

**I.** Plaintiff has never received any counseling or therapy related to his sexual abuse and has never disclosed the sexual abuse to a medical provider.

**J.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury. For instance, Plaintiff's mother was killed in a car wreck when he was eight.

**K.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**L.** Plaintiff lives in Rockford, Illinois. He has an 11-year-old daughter. In July of 2023 a registered sex offender named Antonio Monroe kidnapped, raped, and murdered a 10-year-old little girl who was a classmate of Plaintiff's daughter and who lived

in their neighborhood. The murder occurred in a house only a couple blocks away from Plaintiff's home.

**M.** This horrific event caused Plaintiff to begin obsessing over his children's safety and, consequently, his own victimization at the hands of a sex offender (Presley). He had spent his whole life intentionally avoiding dealing with his own abuse, but this murder of his daughter's playmate by a pedophile removed Plaintiff's ability to keep avoiding it. He became angry and withdrawn, and his fears for his children's safety became almost too much to bear.

**N.** Coincidentally, around this same time Plaintiff learned of and listened to a podcast about the Lord's Ranch and the rampant child abuse experienced there by so many children at the hands of pedophile Emmett Presley. He learned of a Facebook group as well. All of this, combined with the pedophilic murder of his daughter's schoolmate, caused Plaintiff to finally start thinking deeply about his own victimization by Presley and its connection to the effects of injuries and conditions he has suffered.

**O.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

119.    Plaintiff **John Doe 11's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1980. Plaintiff was abused between approximately 1995 and 1996, while Plaintiff was approximately 14 to 16 years old.

**B.** Not until at least 2021 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, and drug abuse.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**G.** Plaintiff tried to forget that the abuse happened and to avoid the memories altogether, as a way to survive.

**H.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**I.** Plaintiff has not received counseling or therapy specifically related to the childhood sexual abuse he experienced at the hands of Presley.

**J.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**K.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

120.    Plaintiff **John Doe 12's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1980. Plaintiff was abused between approximately 1995 and 1997, while Plaintiff was approximately 14 to 17 years old.

**B.** Not until 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These

41

conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to drug abuse, anger issues, intimacy issues, shame, low self-esteem, legal difficulties and imprisonment, poverty and homelessness, and intrusive homosexual thoughts.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff was in and out of prison for much of his adult life, mostly for offenses related to his long-term drug abuse, including heroin addiction.

**H.** Plaintiff is uneducated. He did not graduate high school or obtain a GED.

**I.** Plaintiff spent his adult life suppressing the memory of what Presley did to him, intentionally avoiding processing it or addressing it in any way.

**J.** Plaintiff never spoke about it to anyone after leaving the Lord's Ranch, as far as he knows. It was certainly not something he could have ever safely talked about openly in prison.

**K.** Plaintiff has never been in therapy or counseling.

**L.** Prior to 2023, Plaintiff's mind was chronically clouded by heroin addiction, struggles to feed and house himself, and incarceration, all completely inconducive to psychological self-discovery.

**M.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**N.** In 2023, Plaintiff saw something about the Lord's Ranch on social media, which led him to a podcast about abuses at the Lord's Ranch. This forced Plaintiff to finally start thinking deeply about his own victimization by Presley and its connection to the effects of injuries and conditions he has suffered. It put Plaintiff's abuse front and center in his mind to where he could no longer ignore its existence.

**O.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

121.    Plaintiff **Nathan Harmon's** claims are timely under the Delayed Discovery Act as follows:

**A.** Plaintiff was born in 1983. Plaintiff was abused between approximately 1996 and 1998, while Plaintiff was approximately 12 to 15 years old.

**B.** Not until at least 2021 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These

43

conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, and drug abuse.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**G.** Plaintiff tried to forget that the abuse happened and to avoid the memories altogether, as a way to survive.

**H.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**I.** Plaintiff has not received counseling or therapy specifically related to the childhood sexual abuse he experienced at the hands of Presley.

**J.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**K.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the

childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

122.    Plaintiff **John Doe 14's** claims are timely under the Delayed Discovery Act, as follows:

   **A.** Plaintiff was born in 1979. Plaintiff was abused between approximately 1993 and 1998, while Plaintiff was approximately 13 to 17 years old.

   **B.** Not until 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

   **C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

   **D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, substance abuse disorder(s), and suicidal ideation. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

   **E.** The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, drug abuse, anger, suicide attempts, and incarceration.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff tried to forget that the abuse happened and to avoid the memories altogether, as a way to survive, particularly in prison.

**H.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**I.** Plaintiff has never received any counseling or therapy and never disclosed the sexual abuse by Presley to health provider.

**J.** Plaintiff has spent most of his adult life since leaving the Lord's Ranch in prison. He is, in fact, currently in prison.

**K.** He has very little education, having obtained only a GED.

**L.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**M.** It was Plaintiff's discovery of a podcast concerning the Lord's Ranch and the many abuses that occurred there that forced him to begin reckoning with his own victimization. Prior to this, he actively suppressed memories of Presley rather than attempting to process them.

**N.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

123.    Plaintiff **John Doe 15's** claims are timely under the Delayed Discovery Act, as follows:

A.  Plaintiff was born in 1979. Plaintiff was abused between approximately 1994 and 1998, while Plaintiff was approximately 14 to 18 years old.

B.  Plaintiff did not discover the effect(s) of the injuries or conditions attributable to the childhood sexual abuse described herein before 2023.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, behavioral issues, PTSD, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, and chronic drug abuse.

F.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff was in and out of prison for much of his adult life, mostly for offenses related to his long-term drug abuse.

**H.** Plaintiff lacks formal education.

**I.** Plaintiff has never received any counseling or therapy.

**J.** Plaintiff actively suppressed the memories of the abuse rather than processing the abuse, as a survival mechanism.

**K.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**L.** Plaintiff, in 2023, first discussed the sexual abuse with his brother, who was also a victim of Presley's at the Lord's Ranch. They had learned of a recent podcast about the Lord's Ranch. Plaintiff's discovery process began after the two brothers opened up to each other about their shared experiences with Presley.

**M.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

124.    Plaintiff **John Doe 16's** claims are timely under the Delayed Discovery Act, as follows:

**A.** Plaintiff was born in 1980. Plaintiff was abused between approximately 1994 and 1999, while Plaintiff was approximately 13 to 18 years old.

**B.** Plaintiff did not discover the effect(s) of the injuries or conditions attributable to the childhood sexual abuse described herein before 2023.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** These conditions may include but are not limited to the following: depression, anxiety, impulse control, mood disorders, anger/mood swings, PTSD, and insomnia. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, and chronic drug abuse

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff was in and out of prison for much of his adult life.

**H.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury. For instance, Plaintiff was sexually abused as a child prior to being sent to the Lord's Ranch.

49

**I.** Plaintiff has never been afforded any counseling related to the childhood sexual abuse he experienced at the hands of Presley and others at the Lord's Ranch.

**J.** Plaintiff actively suppressed the memories of the abuse rather than processing the abuse, as a survival mechanism.

**K.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**L.** Plaintiff, in 2023, first discussed the sexual abuse with his brother, who was also a victim of Presley's at the Lord's Ranch. They had learned of a recent podcast about the Lord's Ranch. Plaintiff's discovery process began after the two brothers opened up to each other about their shared experiences with Presley.

**M.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

125.    Plaintiff **John Doe 19's** claims are timely under the Delayed Discovery Act, as follows:

**A.** Plaintiff was born in 1994. Plaintiff was abused between approximately 2006 and 2007, while Plaintiff was approximately 12 to 13 years old.

**B.** Plaintiff did not discover the effect(s) of the injuries or conditions attributable to the childhood sexual abuse described herein before 2022.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff,

psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, PTSD, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to hypervigilance, fear, shame, intimacy issues, marriage problems, low self-esteem, difficulty maintaining relationships, and drug abuse.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

**G.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury. Plaintiff's stepfather physically abused him.

**H.** Plaintiff has never been afforded any counseling or therapy related to the childhood sexual abuse he experienced at the Lord's Ranch.

**I.** Plaintiff tried to hide the fact of his abuse from himself and those around him.

J. One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2022.

K. He first told his wife about the abuse in approximately 2022 and that disclosure set the wheels in motion for his discovery process, which was bolstered by his learning of a podcast concerning the Lord's Ranch.

L. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

126.    Plaintiff **John Doe 20's** claims are timely under the Delayed Discovery Act, as follows:

A. Plaintiff was born in 1982. Plaintiff was abused between approximately 1996 and 2000, while Plaintiff was approximately 13 to 17 years old.

B. Not until at least 2021 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

D. These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly

52

prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, and drug abuse.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**G.** Plaintiff tried to forget that the abuse happened and to avoid the memories altogether, as a way to survive.

**H.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**I.** Plaintiff has not received counseling or therapy specifically related to the childhood sexual abuse he experienced at the hands of Presley.

**J.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**K.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

127.    Plaintiff **John Doe 21's** claims are timely under the Delayed Discovery Act, as follows:

A.  Plaintiff was born in 1991. Plaintiff was abused between approximately 2008 and 2009, while Plaintiff was approximately 16 to 18 years old.

B.  Not until at least 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, and PTSD. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  The effects of the conditions may include but are not limited to hypervigilance, social anxiety, struggles with sexuality, shame, intimacy issues, low self-esteem, difficulty maintaining relationships, and drug abuse.

F.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

G.  Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the Lord's Ranch.

**H.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**I.** In 2023, Plaintiff learned about a Facebook community page whereon other survivors shared their experiences at the Lord's Ranch. This lead him to reflect on his time at the Lord's Ranch, including its effects as a cause for his for his problems and he began to identify the sexual molestations of him as a root cause of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**J.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

128. Plaintiff **John Doe 22's** claims are timely under the Delayed Discovery Act, as follows:

**A.** Plaintiff was born in 1984. Plaintiff was abused between approximately 1999 and 2002, while Plaintiff was approximately 14 to 17 years old.

**B.** Not until 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These

55

conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to anger, trust issues, shame, intimacy issues, low self-esteem, fear of crowds, difficulty maintaining relationships, and substance abuse.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**H.** Plaintiff participated in some counseling, at some point not too long after leaving the Lord's Ranch, at Regional Mental Health (in Chicago) and believes she likely disclosed, at least briefly, the abuse during counseling.

**I.** Plaintiff has struggled with bi-polar disorder since leaving the Lord's Ranch, a condition possibly not related to her abuse, but a condition that contributed to preventing her from making the discovery sooner.

**J.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**K.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

129.    Plaintiff **John Doe 23's** claims are timely under the Delayed Discovery Act, as follows:

**A.** Plaintiff was born in 1990. Plaintiff was abused between approximately 2002 and 2003, while Plaintiff was approximately 12 to 13 years old.

**B.** Not until at least 2021 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to anger, shame, low self-esteem, intimacy issues, relationship problems, long-term drug abuse, legal troubles and imprisonment often due to illegal drug use, and poverty.

**F.** Plaintiff also suffers from conditions likely unrelated to the sexual abuse, including schizophrenia and bipolar disorder, that also greatly contributed to his inability to make the discovery sooner. Schizophrenia is a chronic mental illness that affects thinking, feeling, and behavior. This alone, particularly in a sufferer who lacks financial resources to get treatment, reasonably prevented Plaintiff from ever having the mental clarity to make the discovery.

**G.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**H.** Plaintiff was in and out of prison for much of his adult life.

**I.** Plaintiff has very little education.

**J.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**K.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the Lord's Ranch.

**L.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**M.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

130. Plaintiff **John Doe 24's** claims are timely under the Delayed Discovery Act as

follows:

**A.** Plaintiff was born in 1984. Plaintiff was abused in 2000, while Plaintiff was approximately 16 years old and a resident of the Lord's Ranch.

**B.** Plaintiff, who is not educated in the mental health and related fields, did not discover the effect(s) of the injuries or conditions attributable to the childhood sexual abuse until approximately 2023.

**C.** Prior to that time, Plaintiff did not discover the effects of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

**D.** The aforesaid effects include, without limitation, severe anxiety, depression, social anxiety/discomfort, and bipolar disorder. The existence of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any root cause connection between conditions they are suffering from (and the effects of those conditions) and childhood sexual abuse.

**E.** Plaintiff has never received any therapy or counseling for the abuses experienced at the Lord's Ranch.

**F.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**G.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the

childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

131.    Plaintiff **John Doe 25's** claims are timely under the Delayed Discovery Act as follows:

A.  Plaintiff was born in 1993. Plaintiff was abused in 2005 when Plaintiff was approximately 12 years old.

B.  Plaintiff, who is not educated in the mental health and related fields, did not discover the effect(s) of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

C.  Prior to that time, Plaintiff did not discover the effects of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse prevented that discovery.

D.  The aforesaid effects include, without limitation, severe anxiety. The existence of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any root cause connection between conditions they are suffering from (and the effects of those conditions) and childhood sexual abuse.

E.  Plaintiff does not recall having received any therapy or counseling specifically for the abuses experienced at the Lord's Ranch.

F.  One or more of these conditions or circumstances reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021

    **G.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

132.    Plaintiff **John Doe 27's** claims are timely under the Delayed Discovery Act as follows:

    **A.** Plaintiff was born in 1996. Plaintiff was abused between approximately 2007 and 2009, while Plaintiff was approximately 11 to 13 years old.

    **B.** Not until at least 2021 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

    **C.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

133.    Plaintiff **John Doe 28's** claims are timely under the Delayed Discovery Act as follows:

    **A.** Plaintiff was born in 1989. Plaintiff was abused between approximately 2005 and 2006, while Plaintiff was approximately 15 to 17 years old.

    **B.** Not until at least 2021 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

    **C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

61

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and substance abuse disorder(s). These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

**E.** The effects of the conditions may include but are not limited to shame, sexual dysfunction, intimacy issues, low self-esteem, poverty, difficulty maintaining relationships, and drug abuse.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**G.** Plaintiff tried to forget that the abuse happened and to avoid the memories altogether, as a way to survive.

**H.** Plaintiff, prior to the Lord's Ranch, suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**I.** Plaintiff has not received counseling or therapy specifically related to the childhood sexual abuse he experienced at the hands of Presley.

**J.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

62

K. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

134.    Plaintiff **John Doe 29's** claims are timely under the Delayed Discovery Act as follows:

A. Plaintiff was born in 1987. Plaintiff was abused approximately between 2002 and 2003, when Plaintiff was approximately 15 to 16 years old.

B. Plaintiff did not discover the effects of the injuries or conditions attributable to the childhood sexual abuse(s) described herein until at least 2021, when a friend from the Lord's Ranch passed away, causing her to reflect on her time there.

C. The aforesaid effects include, without limitation, severe anxiety, depression, and PTSD. The existence of this condition commonly prevents victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any root cause connection between conditions they are suffering from (and the effects of those conditions) and childhood sexual abuse.

D. Plaintiff has never received any therapy or counseling related to her sexual abuse.

E. One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

F. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the

childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

135.    Plaintiff **John Doe 30's** claims are timely under the Delayed Discovery Act as follows:

A.  Plaintiff was born in 1997. Plaintiff was abused in 2003, when Plaintiff was 6 years old.

B.  Not until at least 2023 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider (Presley), prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood, or from making any kind of root cause connection between conditions they are suffering from (and the effects of those conditions) and the childhood sexual abuse.

E.  The effects of the conditions may include but are not limited to social anxiety, shame, confusion, inability to complete tasks, low self-esteem, poverty, difficulty maintaining relationships, trust issues, and a belief that his mind and body are attacked by negative spirits.

**F.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until at least 2021.

**G.** Plaintiff does not have much education and is not able to live independently.

**H.** Plaintiff lives with a parent who helps take care of him.

**I.** Plaintiff has never received any therapy or counseling.

**J.** Plaintiff, in addition to his experiences at the Lord's Ranch, has suffered other abuses and traumas that have only made it more difficult for him to comprehend a clear connection between Presley's molestations and any particular injury or the effects of that injury.

**K.** One or more of these facts and circumstances reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2023.

**L.** Plaintiff did not think to connect the dots between his problems and his abuse by Presley until learning of a podcast and Facebook page about abuse at the Lord's Ranch.

**M.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

136.    Plaintiff **Jane Doe 101's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1987. Plaintiff was abused around approximately 2004, while Plaintiff was approximately 17 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

**G.** In approximately, but no earlier than 2022, Plaintiff's psychologist observed that Plaintiff had severe anxiety with respect to parenting. Plaintiff began to reflect on the reasons for this diagnosis and other issues, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a

root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

137.    Plaintiff **Jane Doe 102's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1985. Plaintiff was abused around approximately 2002, while Plaintiff was approximately 17 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, bipolar disorder, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E. One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

G. In approximately, but no earlier than 2023, Plaintiff's psychologist observed that Plaintiff had suffered from depression. Plaintiff began to reflect on the reasons for this diagnosis and other issues, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

138.    Plaintiff **Jane Doe 103's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1986. Plaintiff was abused around approximately 2002, while Plaintiff was approximately 17 years old.

B. Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff,

psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

**G.** In approximately, but no earlier than 2023, Plaintiff became aware of other survivors allegations against Defendants. Plaintiff began to reflect on the reasons for her struggles in life, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the

childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

139.    Plaintiff **Jane Doe 104's** claims are timely under the Delayed Discovery act, as follows:

A.    Plaintiff was born in 1989. Plaintiff was abused around approximately 2002 to 2003, while Plaintiff was approximately 13 years old.

B.    Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.    Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D.    These conditions may include but are not limited to the following: anxiety, depression, bipolar disorder, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.    One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

G. In approximately, but no earlier than 2023, Plaintiff became aware of other survivors allegations against Defendants. Plaintiff began to reflect on the reasons for her various diagnoses and other issues, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

140.    Plaintiff **Jane Doe 105's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1990. Plaintiff was abused around approximately 2002, while Plaintiff was approximately 12 years old.

B. Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

71

**D.** These conditions may include but are not limited to the following: anxiety, depression, bipolar disorder, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

**G.** In approximately, but no earlier than 2022, Plaintiff was diagnosed with anxiety and depression. Around the same time, Plaintiff became aware of other survivors allegations against Defendants and recognized that the diagnoses were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

141.    Plaintiff **Jane Doe 106's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1986. Plaintiff was abused around approximately 2001, while Plaintiff was approximately 15 years old.

B. Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D. These conditions may include but are not limited to the following: anxiety, depression, PTSD, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E. One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

G. In approximately, but no earlier than 2023, Plaintiff became aware of other survivors allegations against Defendants. Plaintiff began to reflect on the reasons for the severe problems she struggles with, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

142.    Plaintiff **Jane Doe 107's** claims are timely under the Delayed Discovery act, as follows:

A. Plaintiff was born in 1986. Plaintiff was abused around approximately 2001, while Plaintiff was approximately 15 years old.

B. Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C. Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D. These conditions may include but are not limited to the following: anxiety, depression, PTSD, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community.

The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.   One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F.   Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

G.   In approximately, but no earlier than 2023, Plaintiff became aware of other survivors allegations against Defendants. Plaintiff began to reflect on the reasons for the severe problems she struggles with, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

H.   Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

143.   Plaintiff **John Doe 101's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1991. Plaintiff was abused around approximately 2007, while Plaintiff was approximately 16 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and bipolar disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, upon the death of his mother and disputes with his father, Plaintiff began to reflect on his life, including the reasons for his problems. And it was only then

that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

144.    Plaintiff **John Doe 102's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1990. Plaintiff was abused around approximately 2005, while Plaintiff was approximately 15 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, and anger management issues. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood –

77

from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff was never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch until 2023.

**G.** In 2023, after having been in general therapy and learning about the existence of other claims against the Lord's Ranch, Plaintiff began to reflect on his life, including the reasons for his problems. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

145.    Plaintiff **John Doe 103's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1993. Plaintiff was abused around approximately 2006 to 2009, while Plaintiff was approximately 13 to 16 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, upon learning of the podcast regarding abuse at the Lord's Ranch, Plaintiff began to reflect on his life, including the reasons for his problems. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H.   Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

146.   Plaintiff **John Doe 104's** claims are timely under the Delayed Discovery act, as follows:

A.   Plaintiff was born in 1991. Plaintiff was abused around approximately 2006, while Plaintiff was approximately 15 years old.

B.   Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.   Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D.   These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

    **E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

    **F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

    **G.** In 2023, upon seeing information regarding abuse at the Lord's Ranch on Facebook, Plaintiff immediately had a flashback to the traumatic abuse he suffered. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

    **H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

147.    Plaintiff **John Doe 105's** claims are timely under the Delayed Discovery act, as follows:

    **A.** Plaintiff was born in 1994. Plaintiff was abused around approximately 2006 and again in 2008, while Plaintiff was approximately 12 years old and 14 years old respectively.

    **B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, upon seeing information regarding other claims of abuse at the Lord's Ranch in a podcast, Plaintiff reflected upon the abuse and the effect that the abuse had upon him. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

        **H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

148.    Plaintiff **John Doe 106's** claims are timely under Revival Act as he turned 21 years old after the July 28, 2021 effective date of the Revival Act, which eliminated the statute of limitations for survivors of child sexual abuse whose claims have not yet expired.

149.    Plaintiff **John Doe 107's** claims are timely under the Delayed Discovery act, as follows:

        **A.** Plaintiff was born in 1983. Plaintiff was abused around approximately 1995 to 1997 while Plaintiff was approximately 12 to 14 years old.

        **B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

        **C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

        **D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of

root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, Plaintiff was diagnosed with PTSD. Plaintiff had become aware of the podcast bringing light to the abuses at the Lord's Ranch and felt compelled to engage in therapy, where he could talk about the abuse he suffered. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

150.    Plaintiff **Jami Wells's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1987. Plaintiff was abused around approximately 2002, while Plaintiff was approximately 15 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, PTSD, and substance abuse disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

**G.** In approximately, but no earlier than 2023, Plaintiff became aware of other survivors allegations against Defendants. Plaintiff began to going to therapy as a result of engaging in behavior that directly related her value as a person to providing sexual gratification to others, and determined that the behavior that she was engaging in, the lack of self-worth that she was struggling with, and other

issues were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

151.    Plaintiff **Jane Doe 109's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1982. Plaintiff was abused around approximately 1990 to 1999, while Plaintiff was approximately 18 to 17 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, PTSD, night terrors, and self-esteem issues. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or

conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on her life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff was not afforded any counseling specifically related to the childhood sexual abuse she experienced at the hands of employees of the Lord's Ranch.

**G.** In approximately, but no earlier than 2022, Plaintiff engaged in conversations with a therapist regarding having sleep issues including night terrors for the previous 10 years, along with repeated issues of tolerating physically abusive relationships. Plaintiff began to reflect on the reasons for the severe problems she struggles with, and determined that they were the result of being abused by employees at the Lord's Ranch who were supposed to protect her. And it was only then that she recognized the abuse she suffered as a root cause of some of her struggles, which she then began to think of in terms of psychological injuries and she was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

152.    Plaintiff **John Doe 108's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1982. Plaintiff was abused around approximately 1991 to 2001 while Plaintiff was approximately 9 to 18 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** Plaintiff has been diagnosed with PTSD, anxiety, ADHD, and depression. It was not until Plaintiff became aware of the claims of others against the Lord's Ranch

in 2022 that Plaintiff reflected on the interaction of his time at the Lord's Ranch and the diagnosis he received. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

153.    Plaintiff **John Doe 109's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1980. Plaintiff was abused around approximately the late 1990s while Plaintiff was a minor in his late teens.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, substance abuse, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or

conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F.  Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G.  In 2022, Plaintiff was in a position in life to address his substance abuse disorder and analyze the causes of it. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H.  Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

154.    Plaintiff **John Doe 110's** claims are timely under the Delayed Discovery act, as follows:

A.  Plaintiff was born in 1982. Plaintiff was abused around approximately 1996 to 1999 while Plaintiff was approximately 14 to 17 years old.

B.  Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, post-traumatic stress disorder, sleep deprivation and night terrors. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2022, after struggling with years of vague flashbacks, night terrors, and anxiety, Plaintiff became aware of a podcast for survivors of Child Sexual Abuse at the Lord's Ranch. Upon listening to the podcast, Plaintiff immediately traced these flashbacks and night terrors, along with the anxiety, to his abuse at the Lord's Ranch. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles,

which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

155.    Plaintiff **John Doe 111's** claims are timely under the Delayed Discovery act, as follows:

**A.** Plaintiff was born in 1978. Plaintiff was abused around approximately 1995 to 1997 while Plaintiff was approximately 17 to 18 years old.

**B.** Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

**C.** Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F.  Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G.  In approximately 2023, after the failure of a romantic relationship due to Plaintiffs constant distance and short temper, Plaintiff reflected upon his life. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H.  Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

156.    Plaintiff **John Doe 112's** claims are timely under the Delayed Discovery act, as follows:

A.  Plaintiff was born in 1982. Plaintiff was abused around approximately 1993 to 1999 while Plaintiff was approximately 11 to 17 years old.

B.  Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff,

psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

**D.** These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

**E.** One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

**F.** Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

**G.** In 2023, upon learning of the claims of other survivors of sexual abuse at the Lord's Ranch, Plaintiff was able to reflect on how the abuse he suffered particularly caused him to be aggressive and distant towards others. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

**H.** Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the

childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

157.    Plaintiff **John Doe 113's** claims are timely under the Delayed Discovery act, as follows:

A.  Plaintiff was born in 1993. Plaintiff was abused around approximately 2007 while Plaintiff was approximately 14 years old.

B.  Not until at least 2022 did Plaintiff discover the effect of the injuries or conditions attributable to the childhood sexual abuse described herein.

C.  Prior to that time, Plaintiff did not discover the effect of the injuries or conditions attributable to the childhood sexual abuse because, unbeknownst to Plaintiff, psychological conditions arising from the abuse, which was committed by a mental health care provider, themselves prevented that discovery.

D.  These conditions may include but are not limited to the following: anxiety, depression, and post-traumatic stress disorder. These conditions are common consequences of child sexual abuse as recognized by the mental health community. The presence of any or all of these conditions commonly prevent victims of child sexual abuse from discovering the effect of the injuries or conditions attributable to the childhood sexual abuse until well into adulthood – from making any kind of root cause connection between conditions they are suffering from and the childhood sexual abuse.

E.  One or more of these conditions reasonably prevented Plaintiff from discovering the effects on his life of the injuries or conditions attributable to the childhood sexual abuse until 2022.

F. Plaintiff has never been afforded any counseling specifically related to the childhood sexual abuse he experienced at the hands of employees of the Lord's Ranch.

G. In 2023, upon learning of the claims of other survivors of sexual abuse at the Lord's Ranch, Plaintiff was able to reflect on his life.. And it was only then that he began to identify the sexual molestations of him by employees of the Lord's Ranch as a root cause of some of his struggles, which he then began to think of in terms of psychological injuries and he was able to recognize the effects of those injuries.

H. Plaintiff brought suit for claims based on childhood sexual abuse less than three years after discovering the effect of the injuries or conditions attributable to the childhood sexual abuse. Accordingly, Plaintiff's claims are timely under A.C.A. § 16-56-130.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

158. The Suhl Family founded The Lord's Ranch at the remote Ranch in 1976 as a behavioral health facility, ostensibly intended to help minors up to 17 years old to "[grow] emotionally, spiritually, and behaviorally."

159. In or around 2006, The Lord's Ranch became Trinity Behavioral Health. However, despite the name change, most people including residents and staff still referred to the facility as "The Lord's Ranch."

160. The Suhl Family founded, owned, and ran The Lord's Ranch from 1976 until 2016 when Ted Suhl was convicted of bribery and The Lord's Ranch was closed.

161. The Suhl Family came to Arkansas from California, where Bud Suhl was convicted and served time for running a fraudulent money-order business; The Lord's Ranch was the Suhl Family's next moneymaking scheme, which proved far more lucrative.

162.     The Suhl Family's newfound financial success was dependent on bringing as many children as possible to The Lord's Ranch and keeping them there for as long as possible to profit from Medicaid funding.

163.     From its founding until its closing in 2016, The Lord's Ranch was a place where the adults who owned, operated, and staffed it ("The Lord's Ranch Associates") regularly abused, psychologically, physically, and sexually, the children entrusted to their care and retaliated against any child who tried to get help.

164.     The Lord's Ranch Associates committed premeditated acts of psychological torment against the children entrusted to their care, including confinement in isolation closets and straitjackets.

165.     The Lord's Ranch Associates committed premeditated acts of extreme physical violence and abuse against the children entrusted to their care resulting in serious injuries, including broken bones.

166.     The Lord's Ranch Associates committed premeditated acts of sexual violence against the children entrusted to their care, including rape.

167.     The Lord's Ranch Associates engaged in concerted efforts to cover-up and conceal the widespread abuse at The Lord's Ranch.

168.     When victims reported abuse to other staff, The Lord's Ranch's leadership feigned concern while taking no action to end the abuse or threatened the victims with reprisals should they report the abuse further.

169.     When victims reported abuse to adults outside of The Lord's Ranch, the leadership at The Lord's Ranch took steps to discredit the children, reporting that the children were lying to cover for their own misconduct at The Lord's Ranch.

170.     When victims attempted to get help from outside The Lord's Ranch, leadership at

The Lord's Ranch retaliated against the children with psychological and physical torture.

171.    The Suhl Family, Bud and Shirley Suhl and their son, Ted Suhl, presided over this systematic child abuse.

172.    The causes asserted in this lawsuit are for child sexual abuses that multiple staff members perpetrated upon these plaintiffs, which would not have been possible absent the approval, tacit or otherwise, of the Suhl Family, whose active participation in covering up child sexual abuse at The Lord's Ranch was a driving force behind decades of child abuse.

173.    The Suhl Family, including Defendants Ted Suhl and Shirley Suhl, made the intentional decision not to interfere with staff members, including Emmett Presley, who raped and sexually molested children under their care.

174.    The Suhl Family and their subordinates, including Alonza Jiles never lifted a finger to help the children under their care or prevent their sexual abuse by Presley and others.

175.    Instead, they did everything in their power to silence the many children who reported Emmett Presley's and others' predations, thereby ensuring that the horrific abuse continued unabated while the Suhl Family profited financially from operating The Lord's Ranch, unchecked by outside influences and prying eyes.

176.    While Emmett Presley was the most notorious and prolific perpetrator of child sexual abuse at The Lord's Ranch, he was not the only staff member who sexually exploited children there; other accused perpetrators of include, but are not limited to, Tyree Davis, Stanley Jackson, Rick Reynolds, Philander Kirk, Stephen Marlow, and Gary Jackson.

177.    The Lord's Ranch leadership, including Bud Suhl, Ted Suhl, Shirley Suhl and several long-serving staff members, including but not limited to or Alonza Jiles, Philander Kirk, and Gary Jackson, were fully aware that minors were being physically and sexually abused at The Lord's Ranch.

178.    While this lawsuit does not solely focus on the innumerable sexual abuses of boys committed by Emmet Presley, it should still be noted that The Lord's Ranch leadership, including Bud Suhl, Ted Suhl, Shirley Suhl and several long-serving staff members, including but not limited to Deputy Administrator Alonza Jiles, Philander Kirk, and Gary Jackson, were expressly aware that, among other abusers, The Lord's Ranch's most senior mental health counselor, Emmett Presley, was habitually raping and sexually molesting minor, male residents, particularly Emmett Presley's patients at The Lord's Ranch.  They were fully aware of this throughout the twenty or more years that Emmett Presley was employed at The Lord's Ranch.

179.    At all relevant times, TLR, including but not limited to Ted Suhl, Shirley Suhl, Emmett Presley, and/or Alonza Jiles, engaged in the transportation of minors for prohibited sexual conduct.

180.    They transported, financed in whole or part the transportation of, and/or otherwise caused or facilitated the movement of minors from across the country to The Lord's Ranch in part for the purpose of sexual abuse and exploitation.

**A.    The Lord's Ranch Defendants used Calculated Corruption and Deception to Game the System for Financial Gain, Mislead the Public, and Cover-Up the Systemic Abuse of Children.**

181.    The Lord's Ranch Defendants, led by Bud, Shirley and Ted Suhl, gamed the system for personal and financial gain through years of corruption, bribery, calculated political donations, legislative lobbying, and by invoking religious doctrine and cause when it suited them.

182.    Ted Suhl was appointed to the Arkansas Child Welfare Agency Review Board in 2000 and reappointed in 2004.

183.    The Arkansas Child Welfare Agency Review Board was responsible for licensing childcare facilities within the State of Arkansas, including those owned and operated by the Suhl Family, enabling Suhl to essentially police himself and his criminal organization.

184.    During this time period, the State of Arkansas created a system that allowed health care providers of residential treatment to hold oversight positions for their own industry.

185.    From 1996-2007, Ted Suhl also lobbied heavily to keep state Medicaid dollars flowing to his TLRE residential care facilities.

186.    From 2002 through 2008, TLRE were paid approximately $95 million by the State of Arkansas in Medicaid funds.

187.    According to a study by an outside consultant hired by the state of Arkansas in 2006 to evaluate the Medicaid program, despite Arkansas spending a disproportionate amount of money on residential care for troubled kids, children in Arkansas were not getting quality mental health care.

188.    In 2007, the Arkansas Child Welfare board, of which Ted Suhl was a member, defeated a proposal by Arkansas state Sen. Sue Madison to make the board independent of the facilities it regulated.

189.    In or around 2007, a study commissioned by the Arkansas state legislature found that the state's policies pertaining to the way Arkansas provided mental health care to its children were out-of-date with current medical opinion, that regulation was fragmented and ineffective, and that "the state was spending an inordinate amount of Medicaid dollars (according to our figures the second highest in the nation) on residential mental health care."

190.    From 2009 through 2014, TLRE were paid over $135 million for Medicaid inpatient and outpatient psychiatric services.

191.    Alaska's Department of Health and Social Services behavioral health division sent juveniles to The Ranch beginning in or around 2002 when the facility was still called The Lord's Ranch and continued to send juveniles there after the name changed to Trinity Health in 2006 up until October 2014.

192.    The Lord's Ranch built relationships with numerous other states, including Indiana, Illinois, and Texas.

193.    The Lord's Ranch held itself out to the public as a safe place for children to receive professional, therapeutic treatment, education, and moral guidance in a beautiful, tranquil, natural environment. For example, on its website, The Lord's Ranch stated in part:

> Over twenty years later, The Lord's Ranch is still operated under the directorship of Bud Suhl. Lovingly working together with his family and team members, their commitment to that beginning vision continues to make a difference in the life of every child. The Lord's Ranch has grown from one main building to a residential campus network of multiple buildings and homes in the small community of Warm Springs, Arkansas.

> The Lord's Ranch is nestled in the beautiful surroundings of the Ozark foothills. Over 1,100 acres of green rolling hills, small shimmering lakes, flowering trees and horse pastures promise tranquility, a restful atmosphere, peace and the beauty of nature. It is this setting that the Suhls' vision of Total Concept Healing (psychological, medical, emotional and spiritual) takes place.

> At The Lord's Ranch, we have developed a program unlike other residential resources. Our mission is to provide the best possible treatment in a setting which is as comfortable and homelike as possible. We create a family environment that promotes the development of trust and a feeling of security within the residents. The main 1100 acre spread holds a massive, 5000 square foot main lodge, cottages, school, chapel, vocational building, and lovely lakes, ponds, and wildlife habitats. In fact, for many of us, The Lord's Ranch is our home. We are not shift workers who work our shift and go home. We live with the children and are committed to the lives of children. We believe in our mission of helping children grow to be healthy and productive adults, and helping in a way so that they are made to feel part of a family and part of a community. Although we are bigger now than we were in 1976, the Suhl Family is dedicated to maintaining the warm friendly feel of a large extended family, nestled comfortably in a quiet, caring community.

> One good sign of a happy and healthy family is the ability to laugh and have fun together. Just as in a functional family, laughter, stories of the day's events and relational insights can be heard around the dinner table. Here at the Ranch, we set aside time to have fun. Activities like fishing, field trips, educational trips and trips to amusement parks and ball games are part of our programming. We believe in the use of pet therapy in building confidence and responsibility in youth. And we believe in the celebration of life, through celebration of special times like decorating for Christmas, graduations and birthdays . . .

> Any building can be termed a residential treatment center. It takes special people and a higher level of caring to turn that facility into a loving, nurturing environment.

101

And although The Lord's Ranch houses over 70 "family" members, it is, in every sense of the word, a home.

194.    The Lord's Ranch highlighted its therapeutic program to the public and the states sending children to its facilities, stating in part on its website:

a.  Our program is integrated by our teams of professionals: medical staff, social workers, special education teachers, advisors, administrative staff, consulting staff, and religious staff. Individual and group counseling, based on each child's needs, is provided by a psychologist and a licensed, clinical social worker, who also directs the development of individualized treatment programs. Psychological and psychiatric services are provided on a consultation basis . . . The Lord's Ranch provides a therapeutic treatment plan tailored to meet the needs of each resident. Group sessions, designed to use the Bible as the main source of reference, are conducted on a daily basis for all residents.

b.  The Lord's Ranch provides an intensive therapeutic program, with a therapist to resident ratio of approximately 9:1.

195.    At all relevant times, The Lord's Ranch Defendants actively misled the public and the states sending children to its facilities regarding the systemic abuse that the children were being subjected to on a regular basis at its facility in Warm Springs, AR, whereby The Lord's Ranch Defendants included photos like those below in *Figures 2-4* on its website and brochures highlighting the religious, moral instruction provided and the outdoor activities it claimed to offer.



*Figure 2*



*Figure 3*



*Figure 4*

196.    On The Lord's Ranch webpage discussing its "Therapeutic Program," the TLRE

stated in part:

> Finally, and most importantly, The Ranch program emphasizes the need for
> spiritual development. Without the proper spiritual framework and values, the
> best educational and therapeutic programs in the world will fail. The program
> offers exposure to Judeo-Christian values and Judeo-Christian traditions to help
> residents find their own way to spirituality.

197.    At all relevant times, Defendants Ted Suhl and Shirley Suhl were expressly aware

children were being physically, psychologically, and sexually abused at The Lord's Ranch, including

being expressly aware that The Lord's Ranch's Director of Social Services Emmett Presley was

sexually abusing his patients (children at The Lord's Ranch under his care and supervision).

103

198.    At all relevant times, The Lord's Ranch Entities held out administrators and staff they knew were sexual predators, such as Emmett Presley, as adults that should be trusted and as well-qualified to help the children sent to the facility.

199.    For example, despite receiving express reports and complaints throughout the 1990s from numerous children that Presley was sexually abusing them, including specifically numerous accounts of oral rape, in 2000, The Lord's Ranch was still holding Presley out on its website and to the public as one of its most senior administrators that should be trusted. His bio on The Lord's Ranch website stated in part:

> Emmett A. Presley, MSWAC, LCSW, ACSW, QCSW, DCSW, Director of Social Services – Mr. Presley's primary responsibilities are to coordinate social work services, prepare diagnostic summaries, develop and review service plans, and provide therapeutic treatment services. Mr. Presley is a full-time administrative staff member and is on call 24 hours per day.

**B.    Children were Sexually and Physically Abused at The Ranch for Decades.**

200.    Numerous The Lord's Ranch staff sexually, physically, and psychologically abused countless minor residents until 2016 when the facility was forced to close down.

201.    Illinois state entities have records of reported abuse at The Lord's Ranch going back to the late 1980s and early 1990s.

202.    In the first five years The Lord's Ranch accepted Illinois children (around 1988-1993), The Lord's Ranch had a contentious relationship with Illinois state officials. In 1989, the Illinois Department of Children and Family Services (DCFS) attempted to withdraw kids from the facility for, among other reasons, it had found that there were untrained, convicted felons working as counselors with children. Moreover, the State of Illinois's education evaluators reported that children were put in the Lawrence County Jail (Walnut Ridge, AR) for discipline.

203.    After reassurances from The Lord's Ranch Defendants, in or around February 1992, the Illinois state education board gave full approval to The Lord's Ranch's license.

204.     In 1992, the Illinois DCFS stopped sending children to The Lord's Ranch, but the Chicago Board of Education, Cook County Public Guardian's Office, and other public-school officials continued to send children there.

205.     As of at least 1990, the Arkansas Department of Human Services (DHS) had received reports of child abuse at The Lord's Ranch, including but not limited to improper restraints on minors, physical abuse, and other unwarranted punishments for minor infractions.

206.     In 1993, the Arkansas DHS made a finding against The Lord's Ranch involving an incident where a The Lord's Ranch staff member reported to Arkansas child welfare inspectors that a counselor at the facility threw a boy against lockers and hit him in the head. The Arkansas DHS investigated and found the report credible.

207.     In 2006, the Arkansas DHS received allegations by an Alaska youth that he had been assaulted at The Lord's Ranch and that he'd been taunted as "gay" afterward.

208.     In 2006, Arkansas state Rep. Buddy Blair of Fort Smith convened a legislative hearing to look into The Lord's Ranch because, he said, he had received "too many complaints" against it. One of those complaints, Blair told legislators, was that staff at The Lord's Ranch punished children by sitting on them, pulling their arms behind their backs or making them stand against a wall all day. Suhl attended the hearing, saying he would discipline staff if it were proved that the accusations were true.

209.     The Lord's Ranch took patients from Alaska's Department of Health and Social Services behavioral health division beginning in 2002, when the facility was called The Lord's Ranch (name changed to Trinity Health in 2006.)

210.     As a matter of practice and custom, when Lord's Ranch staff members reported to their supervisors that they witnessed other staff members sexually or physically abuse residents, Lord's Ranch leadership took little to no action to investigate the allegations of child abuse or

take actions to ensure the safety of the children. Lord's Ranch employees who were alleged to have abused residents were regularly permitted to continue working at the Lord's Ranch.

211.    For example, in around 2004-2005, a female Lord's Ranch residential advisor (hereinafter referred to as "Residential Advisor A") witnessed Defendant Tyree Davis lock himself alone in a "seclusion room" with a minor female resident. Residential Advisor A heard loud banging inside the room, sounding as if the resident was being beaten up. The residential advisor was unable to see inside the seclusion room. When Davis came out of the seclusion room, the student's ear had busted cartilage, looking like cauliflower ear. The female resident was crying and told the residential advisor that "[Davis] broke my ear." Davis told the girl as they came out of the room, he "only did that cause I love you and I see potential in you." The residential advisor reported the incident to her supervisor Defendant Alonza Jiles. Despite the report, Davis never faced any repercussions for the abuse. Staff continued to hear of incidents of abuse perpetrated by Davis or witness abuse themselves, yet Davis remained employed by the Lord's Ranch for years.

212.    At all relevant times, it was well known amongst staff that certain adult staff members were grooming and sexually abusing minor residents. When Lord's Ranch leadership was informed of staff being in sexual relationships with minors, they failed to report the abuse to civil authorities or law enforcement, including even after other staff made reports of sexual abuse.

### C.    2014-2019: Criminal Investigations, Charges, and Convictions.

213.    In or around October 2014, Assistant US Attorney General Leslie R. Caldwell of the Justice Department's Criminal Division and First Assistant United States Attorney Patrick C. Harris of the Eastern District of Arkansas made a public announcement that a former deputy director of the Arkansas Department of Human Services (DHS), Steven B. Jones, pled guilty to

charges of providing official assistance to Ted Suhl in exchange for bribes concerning programs receiving federal funds.

214.    A sentencing hearing was scheduled for April 2, 2015, before a U.S. District Judge of the Eastern District of Arkansas.

215.    According to his plea agreement, Steven B. Jones served as deputy director of Arkansas DHS from approximately April 2007 until July 2013. While serving in that capacity, Jones solicited and accepted multiple cash payments and other things of value from the owner of two businesses (Ted Suhl) that provided inpatient and outpatient mental health services to juveniles. This individual (Ted Suhl) provided the cash payments and other things of value to Jones through the use of two intermediaries, a local pastor and a former county probation officer and city councilman.

216.    As part of his plea, Steven B. Jones admitted that in return for the bribes, he provided official assistance, including providing internal Arkansas DHS information about the individual's businesses. Steven B. Jones further admitted that he and other members of the conspiracy concealed their dealings by, among other things, holding meetings at restaurants in Memphis, Tennessee, or rural Arkansas, where they would not be easily recognized; funneling the cash payments through the pastor's church; providing the bribe payments in cash so that the transactions would not be easily traceable; and speaking in code during telephone conversations.

217.    The case was investigated by the FBI's Little Rock Field Office and was prosecuted by the Criminal Division's Public Integrity Section and Assistant U.S. Attorneys from the Eastern District of Arkansas.

218.    In or around October 2014, Arkansas Department of Human Services Director announced Trinity Behavioral Health Care and Maxus Inc., two companies that Ted Suhl owned, had been suspended from receiving new Medicaid claims earlier that month after a former

Arkansas Human Services Department deputy director pleaded guilty to accepting bribes in exchange for inside information that benefited the two Suhl companies (Trinity Behavioral Health and Maxus, Inc., doing business as Arkansas Counseling Associates)

219.    Arkansas's DHS publicly stated at the time: "So the [Trinity and Maxus] clients can decide whether to leave or not, but the state will not be providing any payments to that provider, and it's a party we paid about $25 million to last year."

220.    Arkansas DHS assisted its Trinity and Maxus patients in transferring to other providers. At the time, Trinity was providing inpatient treatment for approximately 90 children. Maxus, which did business under the name Arkansas Counseling Associates, provided outpatient care to approximately 2,500 adults and children. Both were providing mental health services at The Lord's Ranch facility in Warm Springs, AR.

221.    In or around October 2014, Alaska's Department of Health and Social Services also suspended Ted Suhl's The Lord's Ranch Entities based out of Warm Springs, AR (Trinity Behavioral Health and Maxus, Inc.) from its Medicaid program.

222.    In or around October 2014, Alaska's Department of Health and Social Services sent a clinician to Trinity Behavioral Health to assist in transitioning the 10 Alaskan children living there to other providers (about 90 children were still living at The Lord's Ranch at the time).

223.    In November 2014, a federal court in the Eastern District of Arkansas denied The Lord's Ranch Defendants' request for an injunction to stop Arkansas from cutting off Medicaid payments to Trinity Behavioral Health and Maxus, Inc.

224.    In or around December 2015, a federal grand jury indicted Ted Suhl for bribing a former deputy director of the Arkansas Department of Human Services. The six-count indictment charged Suhl with conspiracy to commit bribery and honest service fraud, three counts of honest services fraud, one count federal funds bribery, and one count of interstate travel in aid of bribery.

The indictment alleged Ted Suhl bribed Steven B. Jones, former deputy director of ADHS, to "perform acts in his official capacity that benefited Suhl and his mental health companies and to provide internal ADHS information to Suhl."

225.    In or around February 2016, Ted Suhl's other accomplice, Phillip Carter, was sentenced to two years (24 months) in prison after admitting he funneled bribes from Ted Suhl to Steven B. Jones. Carter pleaded guilty to conspiracy to commit federal funds bribery and honest services wire fraud.

226.    During the state's investigations leading up to Ted Suhl's 2016 trial for bribery and fraud, some Arkansas legislators publicly stated that the discovery they obtained during their investigation revealed "there was inordinate spending in Arkansas, compared with other states, on expensive residential care rather than community-based services."

227.    Ted Suhl had charged the State of Arkansas higher rates for supposed treatments provided as compared to rates for other states.

228.    In or around July 2016, a federal jury in the Eastern District of Arkansas, located in Little Rock, found Ted Suhl guilty of four out of the six counts against him in what prosecutors alleged was a scheme to bribe a high-ranking Arkansas official. The jury found Ted Suhl guilty of two counts of honest services fraud, one count of bribery involving federal funds, and one count of interstate travel in aid of bribery.

229.    During the trial, which began July 13, 2016, prosecutors with the U.S. Department of Justice sought to show through testimony and evidence, including recorded phone calls, that on multiple occasions between 2007 and 2011 Ted Suhl bribed Steven B. Jones, then deputy director of the state Arkansas Department of Human Services, in exchange for official acts to benefit Ted Suhl and his mental-health businesses, including The Lord's Ranch.

230.    Prosecutors alleged that Ted Suhl had a series of meetings at restaurants with Simon

B Jones and Phillip Carter, a former West Memphis city councilman and a former Crittenden County juvenile probation officer, so Ted Suhl could request help from Jones.

231.    According to prosecutors, Ted Suhl gave checks to Phillip Carter that were made out to the 15th Street Church of God in Christ in West Memphis, and Carter took the checks to the church, received cash for them and provided cash to Steven B. Jones. John Bennett, who was the church's pastor at the time, died in 2014 without ever being charged in the case.

232.    A U.S. attorney prosecuting Ted Suhl alleged that: "Putting Jones on Suhl's illicit payroll paved the way for more than $1.5 million in profits for Suhl's juvenile mental health counseling business."

233.    Ted Suhl's two accomplices who were still alive at the time pleaded guilty to the related criminal charges prior to Ted Suhl's July 2016 criminal trial in Little Rock, AR. Steven B. Jones was sentenced in February 2016 to two and a half years (30 months) in prison. As part of his plea agreement, he admitted he accepted more than $10,000 from Ted Suhl. Phillip Carter was also sentenced in February 2016 to two years (24 months) in prison after admitting he funneled bribes from Ted Suhl to Steven B. Jones.

234.    A federal judge sentenced Ted Suhl to seven years (84 months) in prison for his part in a scheme to bribe a former deputy director of the Arkansas Department of Human Services. The judge also sentenced Suhl, who owned two mental health companies in Arkansas, including The Lord's Ranch later renamed Trinity Behavioral Health, to pay a $200,000 fine.

235.    In January 2017, Ted Suhl reported to the Arkansas Department of Correction after a federal judge denied his request to stay his prison sentence until the appeals ran their course.

236.    In March 2018, the Eighth Circuit Court of Appeals upheld Ted Suhl's 2016 convictions and correlating prison sentence and fine, citing Suhl's effort to increase his companies' Medicaid reimbursement rates by bribing the state official.

237.    In July of 2019, President Donald Trump commuted Ted Suhl's prison sentence and Suhl was freed after serving less than three years of his seven-year sentence.

**D.     Facts Specific to Plaintiffs**



*Figure 5, Photograph of Ted Suhl*



*Figure 6, Photograph of Emmett Presley at The Lord's Ranch*

238.    John Doe 1 was sent to The Lord's Ranch in or around 1997 and remained until

111

2000. While a minor resident of The Lord's Ranch, he was sexually molested and raped by Emmett Presley dozens of times, at nearly every weekly counseling session, over an approximately two-year period. The abuse included but was not limited to oral rape, genital molestation, and child pornography, as Emmett Presley sometimes took photos of what he was doing to John Doe 1.

239.    After the first few months of regularly occurring sexual abuse by Emmett Presley, John Doe 1 told staff member Gary Jackson, who then brought in staff member Philander Kirk and senior administrator Alonza Jiles to hear John Doe 1's account of the sexual abuse. The three men called him a liar and told him that the consequences would be severe should he ever utter another word about the abuse. A week or two later, staff subjected John Doe 1 to a violent physical restraint in which they broke his collarbone, ostensibly over the trivial offense of looking at girls during church, but in reality, this was a warning from the Suhl Family, a reminder to John Doe 1 of how much worse things could get should he report the sexual abuse by Emmett Presley. Emmett Presley continued to sexually molest and orally rape John Doe 1 on a near weekly basis for at least another year after this.

240.    John Doe 2 was sent to The Lord's Ranch as a minor and remained there from approximately 1991 to approximately 1995. While a minor resident of The Lord's Ranch, he was orally raped and sexually molested by Emmett Presley on multiple occasions beginning in or around 1992. Two of the incidents occurred in John Doe 2's bedroom in the Murphy House. Both times Emmett Presley promised John Doe 2 that he would help him get to go home if he submitted to the oral rapes.

241.    John Doe 2 reported the first rape directly to Bud Suhl. John Doe 2 was promptly brought into a room and made to sit on the floor where he was surrounded by Bud Suhl and several other staff, including Ted Suhl, Philander Kirk, Todd Isaacs, and Alonza Jiles, and asked to repeat the allegation. Afterwards, he was warned never to repeat his claims again. Bud Suhl, Ted Suhl,

and the other men told John Doe 2 that if he ever spoke of it again, they would force him to live in isolation in an abandoned building on the edge of the property. They then made him remain sitting on the floor for over an hour so that he could reflect upon his actions in shame. Neither Bud Suhl, Ted Suhl, nor anyone else did anything to help John Doe 2, who was indeed raped again by Emmett Presley after having notified these staff members.

242.    Michael Robinson was a minor resident at The Lord's Ranch beginning in approximately 1999. He was sexually abused as a minor by Emmett Presley, his counselor, on numerous occasions. The sexual abuse included but was not limited to fondling of Michael Robinson's genitals and oral rape. The abuse occurred in Emmett Presley's car.

243.    Michael Robinson reported the sexual abuse to The Lord's Ranch staff members Gary Jackson and Steven Marlow, who feigned surprise and concern, but failed to follow up or take action to stop the abuse from continuing. Michael Robinson also reported the abuse to his mother, who called The Lord's Ranch and was told by the Suhl Family that her son was emotionally disturbed and making up this lie in order to get attention and in order to go home early. The sexual abuse continued.

244.    John Doe 4 was at The Lord's Ranch from around 1995/1996 until around 2003/2004. In around 1995/1996, he was sent to The Lord's Ranch from Chicago, Illinois. His grandmother and mother were led to believe that The Lord's Ranch was a safe place away from the dangers of the City.

245.    Shortly after arriving at The Lord's Ranch, he was assigned Emmett Presley as his counselor, who John Doe 4 understood was the head counselor. Emmett Presley drove John Doe 4 down a country road with another older resident in the back of the car. Emmett Presley pulled over and asked John Doe 4 whether he would like to drive his car. John Doe 4 was only around 10-12 years old at the time. He said yes. When John Doe 4 was in driver seat, Emmett Presley

began to grab his thighs and to grope him, causing John Doe 4 to hit the brakes. Emmett Presley began grabbing John Doe 4's shoulders, telling him that this is how he will take care of him, he will buy John Doe 4 things, let his mother come visit. John Doe 4 told Emmett Presley he did not feel comfortable and did not want to do this.

246.    Suddenly, the older resident that Emmett Presley had brought with them grabbed John Doe 4 by the throat, said "don't move, let [Emmett Presley] do what he wants to do." Emmett Presley then performed oral sex on John Doe 4, and then forced John Doe 4 to perform oral sex on him. John Doe 4 cried during the abuse.

247.    After the abuse, Emmett Presley threatened John Doe 4, stating "If you tell anyone I'm going to make sure [the older resident] gets you … You won't make it out of the Ranch alive … I run everything here … I'm the one who gets you phone calls. I'm the one who gets you visits … No one is going to believe you." After this first incident of sexual abuse, John Doe 4 was dropped off at The Lord's Ranch School. He reported the abuse to Deputy Administrator Alonza Jiles.

248.    The next day Alonza Jiles brought John Doe 4 to the main office to meet with Ted Suhl and John Doe 4 again reported the sexual assault and rape. Ted Suhl and Alonza Jiles listened and then did nothing to help John Doe 4. When Emmett Presley saw John Doe 4 again, he smirked at him and said, "I told you, I told you." The older resident who helped Emmett Presley sexually assault John Doe 4 told him, "you better just get with the program." Emmett Presley continued serving as John Doe 4's counselor and sexually abused him on a regular basis for the next three to four years. Ted Suhl and Alonza Jiles made the intentional decision to allow Emmett Presley to continue molesting and raping John Doe 4.

249.    During John Doe 4's long tenure at The Lord's Ranch, he was also sexually

assaulted by two other staff members and an older resident. All of the incidents were reported to Alonza Jiles, who failed to take action to investigate or protect John Doe 4.

250.    One of the incidents of sexual assault involved a staff member, R.L., who physically beat John Doe 4 viciously one day, including slamming John Doe 4's head into the floor. John Doe 4 cried during the physical attack, and another staff member finally intervened. Shortly thereafter, R.L. entered John Doe 4's bedroom in the middle of the night, pulled his pants down, and attempted to sexually assault him. John Doe 4 reported the assault to staff members Alonza Jiles and Don Rubin. Don Rubin laughed off the allegation. Alonza Jiles stated he would look into the matter, but never followed up.

251.    John Doe 4 was one of the youngest residents at the time he arrived at The Lord's Ranch and was housed with older residents.  When he was around 10-12 years old, he was sexually assaulted by one of the older residents. John Doe 4 reported the abuse to Alonza Jiles, who failed to investigate and otherwise took no action to protect John Doe 4.

252.    During John Doe 4's long tenure at The Lord's Ranch, he made several reports to Alonza Jiles regarding other younger residents who had been physically and/or sexually assaulted. Alonza Jiles failed to take action to investigate the alleged perpetrators or otherwise protect the minor victims.

253.    During John Doe 4's long tenure at The Lord's Ranch, from approximately 1995/1996 – 2003/2004, staff members regularly made threats of sexual violence. As just one example, when physically restraining residents, many staff would make comments to residents about getting used to the abuse they were subjected to because they will experience the same when/if they go to jail, such as "this is what will happen to your ass in jail. So you may as well get used to it."

254.    John Doe 5 was sent to The Lord's Ranch from Chicago, Illinois in around 1994,

when he was approximately 14/15 years old, and stayed until around 1997. Staff from The Lord's Ranch came to Chicago, Illinois, spoke to his mother, and convinced her The Lord's Ranch was a good, safe place to send John Doe 5.

255.    Shortly after arriving at The Lord's Ranch, he was assigned Emmett Presley as his counselor. Within weeks of his arrival, Emmett Presley took John Doe 5 in his car to a secluded area near The Lord's Ranch where he sexually abused and orally raped him. The abuse included Emmett Presley performing oral sex on John Doe 5 and forcing John Doe 5 to perform oral sex on him. To coerce him, Emmett Presley would tell John Doe 5 that he had the power to send him home or send him to jail, and that if he didn't allow him to do what he wanted to do, there would be consequences. John Doe 5, who came from a family with limited education and means, felt trapped.

256.    John Doe 5 reported the abuse to Gary Jackson, Alonza Jiles, and Steven Marlow.

257.    He also reported the abuse to Michael Gibson, another counselor at The Lord's Ranch, telling him "I don't want to be around Emmett Presley because he's a f*n pedophile." At all relevant times, Emmett Presley was Michael Gibson's supervisor. Michael Gibson's response to John Doe 5 suggested he was already aware that Emmett Presley abused residents.

258.    John Doe 5 was sexually abused by Emmett Presley at least one more time after reporting the sexual abuse to staff. The abuse ended when he was eventually permitted to switch counselors.

259.    John Doe 6 was sent to The Lord's Ranch as a minor from the Chicagoland area (Illinois) in or around 2000 and was there until approximately 2004. John Doe 6 was sent to The Lord's Ranch because he struggled emotionally and academically.

260.    John Doe 6 was sexually abused by Emmett Presley on numerous occasions as a

minor.  The sexual abuse occurred on a regular basis, regularly occurring in Emmett Presley's car during drives on The Lord's Ranch property.  Emmett Presley's sexual abuse of John Doe 6 included but was not limited to fondling of his genitals, oral rape, and attempted sodomy.

261.    John Doe 6 reported the sexual abuse to a The Lord's Ranch staff member in approximately late 2000 or early 2001; nothing was done and Emmett Presley's sexual abuse of John Doe 6 continued unabated.

262.    While residing at The Lord's Ranch, John Doe 6 was also subjected to relentless bullying and excessive physical violence by the staff, including and particularly Gary Jackson, Stan Jackson, and Tyree Davis. These staff members regularly called, described, and referred to John Doe 6 with derogatory and humiliating names, including regularly calling him among other names "a fag," "a faggot," and "gay," often in public or otherwise in front of other residents.  The humiliating and demeaning way the staff treated John Doe 6 led other residents to follow their lead and bully and humilate John Doe 6 in the same manner. Staff would laugh when John Doe 6 was called "a fag" or bullied.

263.    In one particularly traumatic incident for John Doe 6, a staff member named Gary Jackson brought John Doe 6 to "the Unit," a house where residents were brought for punishment, put him in a corner, and then spit in his face. Gary Jackson then told John Doe 6 "this is what they're going to do to you when your gay ass is in jail."

264.    Whenever John Doe 6 verbally or physically fought back against the relentless bullying and abuse, staff were particularly physical and violent toward him, often subjecting him to excessive violence for minor infractions, including but not limited to choking and beating him. The beatings sometimes caused John Doe 6 to cry, yet staff rarely if ever showed sympathy.

265.    Maurice Collins was a minor resident at The Lord's Ranch from approximately

1999 to 2003.  His counselor at The Lord's Ranch, Emmett Presley, sexually assaulted Maurice Collins and attempted to rape him orally.  At the time Maurice Collins was abused, and at all relevant times, The Lord's Ranch staff were well aware of what Emmett Presley was doing to children at the facility, yet the administration allowed him to abuse and continue to abuse with impunity.

266.    Maurice Collins was also subjected to excessive physical abuse by staff, which during one attack resulted in him breaking his arm. John Doe 6 complained to the staff about his injured arm, but was never taken to a hospital, and never received the necessary treatment for the injury.

267.    John Doe 8 was sent to The Lord's Ranch from Chicago, Illinois in or around 1991/1992 and stayed at the facility until around 1994. John Doe 8 was sexually abused on multiple occasions as a minor by two staff members.

268.    One of those abusers was Emmett Presley, who was John Doe 8's assigned counselor at The Lord's Ranch.

269.    Upon information and belief, as part of his modus operandi, Emmett Presley used his position as a counselor to get access to and read his victims' medical records so that he was familiar with their vulnerabilities, including whether they came from a broken home, and whether they had been physically or sexually abused and/or neglected prior to arriving at The Lord's Ranch.

270.    During this first incident of abuse, Emmett Presley drove John Doe 8 to a secluded area near The Lord's Ranch, asked him if he wanted to learn to drive, and when John Doe 8 got into the driver's seat, Emmett Presley began to grope his thigh and fondle him and then orally raped him.

271.    After the first instance of sexual abuse by Emmett Presley, John Doe 8 reported it to another staff member, Todd Isaacs. Todd Isaacs asked John Doe 8 who else he had told, and

then told him not to tell anyone else. The sexual abuse continued.

272.    John Doe 9 was sent to The Lord's Ranch from Chicago in or around 2000 and remained until around 2003. While a minor resident of The Lord's Ranch, he was sexually molested and raped by Emmett Presley on numerous occasions. The abuse included but was not limited to oral rape, genital molestation, and being forced to engage in sexual acts with another minor resident in Emmett Presley's presence.

273.    During one of the incidents of abuse, Emmett Presley pulled John Doe 9 out of class and took John Doe 9 and another minor resident for a ride in his car around the backroads surrounding The Lord's Ranch campus. Emmett Presley pulled over, pulled out his penis, and started masturbating in front of John Doe 9 and the other minor resident (referred to herein as Child Doe B). Emmett Presley then performed oral sex on Child Doe B in John Doe 9's presence. Emmett Presley then ordered John Doe 9 to perform oral sex on Child Doe B.

274.    After sexually abusing his victims, such as John Doe 9, Emmett Presley would often take them to a store to purchase candy and other snacks. It was common knowledge amongst staff and other residents that when a resident was returning to The Lord's Ranch campus with snacks purchased by Emmett Presley, it meant the resident had been sexually abused by him. Because he was known to be one of the victims of Emmett Presley, John Doe 9 was referred to as a "homosexual" and relentlessly tormented and teased for being an Emmett Presley victim.

275.    John Doe 9 reported the abuse to Philander Kirk and wrote Alonzo Jiles a letter regarding the abuse, but nothing was done to prevent abuse or otherwise protect John Doe 9, and the abuse continued to occur unabated.

276.    John Doe 9 was also regularly physically abused by staff.

277.    John Doe 10 was sent to The Lord's Ranch from Chicago as a minor, where he

stayed from approximately 1993 to approximately 1996. By 1993, both of John Doe 10's parents were deceased, and he struggled emotionally. While receiving treatment at the Henry Horner Children's Center in or around Oak Park, Illinois, John Doe 10 recalls that a social worker recommended The Lord's Ranch to John Doe 10's grandparent and showed him a promotional pamphlet highlighting The Lord's Ranch's therapeutic program and campus. Upon information and belief, the social worker was friendly with and/or knew Patty Suhl.

278.    One day in or around 1993 Bud Suhl arrived in the Chicagoland area to pick John Doe 10 up and transport him to The Lord's Ranch. During his first week at The Lord's Ranch, John Doe 10 was physically abused by staff member Philander Kirk.

279.    Emmett Presley was assigned to be John Doe 10's counselor. Emmett Presley had access to Plaintiff's medical charts and knew John Doe 10's vulnerabilities, and the fact his parents were deceased. Emmett Presley also knew John Doe 10 loved his grandmother and used his feelings of loneliness, isolation, and longing for the connection and affection of his grandmother to coerce him and sexually abuse him. Emmett Presley told John Doe 10 that if he succumbed to the abuse, Emmett Presley would call John Doe 10's grandmother on his phone and allow him to speak with her. After the abuse, Emmett Presley dialed numbers on his phone, the phone would continue to ring, and he would tell John Doe 10 they would just have to try to call later. Upon information and belief, Emmett Presley would only pretend to call John Doe 10's grandmother.

280.    While a minor resident of The Lord's Ranch, John Doe 10 was orally raped and sexually molested by Emmett Presley on multiple occasions from around 1993-1996. The abuse would take place in Emmett Presley's car. Emmett Presley would take John Doe 10 on car rides around The Lord's Ranch campus where he would pull over in a secluded area to sexually abuse him.

281.    The Lord's Ranch Defendants were well aware that Emmett Presley was sexually abusing male residents well before John Doe 10's abuse; despite this, they did nothing to protect John Doe 10 or stand in Emmett Presley's way.

282.    John Doe 11 was a minor resident at The Lord's Ranch who arrived there in around 1995-1996 when he was around 15 or 16 years old.  He was sexually abused as a minor by Emmett Presley, his counselor, on numerous occasions. The sexual abuse included but was not limited to molesting and fondling of Plaintiff's genitals and attempted oral sex. John Doe 11 told Emmett Presley to stop, but Emmett Presley continued abusing John Doe 11. The abuse occurred in Emmett Presley's car.

283.    Emmett Presley threatened John Doe 11 after the abuse and told him that if he reported the abuse to anyone he would be punished, and no one would believe him.

284.    While at The Lord's Ranch, John Doe 11 was regularly physically and emotionally abused by Gary Jackson and Philander Kirk.

285.    The Lord's Ranch Defendants knew Emmett Presley was sexually abusing male residents well before John Doe 11's abuse; despite this, they did nothing to protect John Doe 11 or hinder Emmett Presley's access to John Doe 11.

286.    John Doe 12 was at The Lord's Ranch from around 1995 until around 1997. He was sent to The Lord's Ranch from Chicago, Illinois. John Doe 12 was sexually abused on numerous occasions by Emmett Presley, who was his designated counselor. The abuse included sexual molestation, groping, and oral rape.

287.    Emmett Presley took John Doe 12 on nature walks as part of his therapy and then sexually abuse him.

288.    During one incident of abuse, Emmett Presley pulled John Doe 12 out of class, brought him to a trailer near the school building, and sexually abused him.

121

289.    After the second incident of sexual abuse, John Doe 12 reported the abuse to Philander Kirk, who feigned concern and said he would check on it. John Doe 12 was never interviewed by any other staff or law enforcement, no examination of him was performed, and he is unaware of any report being made regarding his allegation of sexual abuse. Philander Kirk never followed up with John Doe 12 regarding the abuse.

290.    After reporting the abuse to Philander Kirk, Emmett Presley continued to sexually abuse John Doe 12. As was the case with the many other Emmett Presley victims, the report was ignored by The Lord's Ranch Defendants and the rapes continued.

291.    Emmett Presley would use intimidation and threats to force John Doe 12 to continue to meet Emmett Presley's depraved sexual needs. Emmett Presley would tell John Doe 12 he was very far from home, that no one would believe him, that there was no help coming, and strongly implied that something bad would happen to him if he ever stopped complying.

292.    Alonza Jiles was also specifically made aware that Emmett Presley was sexually abusing John Doe 12, and even told John Doe 12 that he was looking into the matter. Alonza Jiles did nothing, and the sexual abuse continued.

293.    John Doe 12 was also physically abused at The Lord's Ranch. During one incident, staff member Todd Isaacs threw John Doe 12 on the ground and put so much pressure on his face his skin scraped off and his shoulder was severely injured. John Doe 12 was offered no medical treatment after, and still suffers from the shoulder injury to this day.

294.    To minimize the risk residents of The Lord's Ranch would report abuse to their parents, family members, or guardians during the sparse phone calls they were afforded, The Lord's Ranch staff would always be present when phone calls were made by residents. For John Doe 12's phone calls home, Bud Suhl would make the phone call, speak to John Doe 12's family, and guide the conversation between John Doe 12 and his mother in order to make sure the truth

did not get out.

295.    Nathan Harmon was placed at The Lord's Ranch from approximately 1996, when he was around 13 or 14 years old, until around 1998. When Nathan Harmon was around 13 or 14 years of age, Emmett Presley began to groom and sexually abuse him. Nathan Harmon was sexually abused and orally raped by Emmett Presley on numerous occasions.

296.    Emmett Presley told Nathan Harmon that he could improve his living conditions at the Ranch and make sure everyone took it easy on him. And when Nathan Harmon responded that he would like that, Emmett Presley then began groping Plaintiff's inner thigh and then stuck his hand inside Nathan Harmon's pants and began masturbating Nathan Harmon. Emmett Presley's sexual abuse of Nathan Harmon escalated to oral rape. The abuse by Emmett Presley occurred in Emmett Presley's car.

297.    Nathan Harmon was also sexually abused on numerous occasions by a staff member named Jeff, believed to be from Haiti. Jeff forced Nathan Harmon and another minor resident (herein referred to as Child Doe C) to get naked and lay down on Jeff's bed. He then forced them to perform sexual acts on one another as well as on Jeff.

298.    Plaintiff was regularly physically abused and beaten by The Lord's Ranch staff members. One staff member, a counselor named Rick Reynolds, choked Nathan Harmon until he gave him the money Nathan Harmon's parents had sent him. Staff members Gary Jackson and Rick Reynolds also instructed older boys to beat Nathan Harmon.

299.    Nathan Harmon still suffers from a shoulder injury caused by physical abuse at The Lord's Ranch.

300.    When Nathan Harmon attempted to report abuse to his mother, The Lord's Ranch staff would cut the call and otherwise take actions to prevent him from reporting the abuse.

301.    Nathan Harmon reported the sexual abuse directly to Gary Jackson and PhilanderKirk. Nathan Harmon was taken to the main house where Ted Suhl's office was located, where he also told Ted Suhl that he was being sexually abused by Emmett Presley and by Jeff. Ted Suhl became angry, called Nathan Harmon a liar, and told him if he kept making false accusations that he won't get to see his family again or make any calls home.

302.    The sexually abuse, of course, continued after this encounter with Ted Suhl, who simply had no interest in preventing it – yet another specific example of the Suhl Family condoning child rape at The Lord's Ranch.

303.    John Doe 14 was a minor resident at The Lord's Ranch from approximately 1993 to 1998. His counselor at The Lord's Ranch, Emmett Presley, regularly sexually abused John Doe 14 while he was at The Lord's Ranch.

304.    John Doe 15 was sent to The Lord's Ranch as a minor from Chicago, Illinois in or around 1994 and stayed at the facility until around 1998. The head counselor at The Lord's Ranch, Emmett Presley, regularly sexually abused John Doe 14 while he was a minor residing at the facility. Emmett Presley would coerce John Doe 14 by telling him things such as "I have the power to send you to jail."

305.    John Doe 15 reported the abuse to staff including Philander Kirk, Alonza Jiles, Bud Suhl, and Ted Suhl. Nothing was done to protect John Doe 15 and the sexual abuse continued unabated.

306.    Staff including Emmett Presley sought to punish John Doe 15 for reporting the abuse and intimidate him into silence by, among other things, ordering him to "keep [his] mouth shut" and making statements such as "What you thought I wouldn't find out? I've been working here a long time . . . and they're [the staff] are going to tell me everything you say about me."

307.    John Doe 15 was also subjected to excessive physical abuse by staff causing

124

physical injuries to his right arm, such as torn ligaments, which he still suffers from today.

308.    John Doe 16 was sent to The Lord's Ranch from Chicago, Illinois in or around 1994 and stayed at the facility until around 1999.  Patty Suhl and Bud Suhl were involved in John Doe 16's transport from Chicago to The Lord's Ranch. At all relevant times, he was a minor. The head counselor at The Lord's Ranch, Emmett Presley, regularly sexually abused John Doe 16 for years while he was a minor residing at the facility.

309.    During his tenure at The Lord's Ranch, John Doe 16 reported the abuse to several staff members, including Philander Kirk, a staff member named Bill, a staff member named Charles, and Bud Suhl. The Lord's Ranch staff failed to take any actions to protect John Doe 16, and the child sexual abuse continued. Bill told John Doe 16, "What do you want me to do about it?" Charles told John Doe 16 that he was lying, and that John Doe 16 had to recant in the name of Jesus and atone. When Bud Suhl was told, he responded saying: "Staff here are good people, they're here to help people, and you're going to be okay…."

310.    John Doe 19 was a minor resident of The Lord's Ranch from approximately 2006 to 2007. While a minor resident of The Lord's Ranch, John Doe 19 was sexually abused on at least two occasions by a staff member believed to be Emmett Presley. The abuse included forced mutual fondling of genitalia, occurring in Emmett Presley's car and office.

311.    Prior to and during the time of John Doe 19's abuse, and at all relevant times, The Lord's Ranch Defendants were well aware of what Emmett Presley was doing to children at the facility, yet the administration and the Suhl Family allowed him to continue to sexually abuse children with impunity, including this John Doe 19.

312.    John Doe 20 was a minor resident of The Lord's Ranch from approximately 1996 to 2000. He was sent there after the death of his mother, which had left him as a ward of the state of Illinois. On at least one occasion, John Doe 20 was sexually abused by Emmett Presley in

125

Emmett Presley's car after going for a drive.

313.    John Doe 20 immediately told staff members Philander Kirk, Gary Jackson, and Alonzo Giles what Emmett Presley had done. These staff members immediately responded with threats and reprisals towards John Doe 20. The Lord's Ranch Defendants punished him for talking about the sexual abuse by forcing him to live apart from the other residents, what John Doe 20 refers to as isolation, for several weeks. The Lord's Ranch Defendants further threatened John Doe 20 that, if he ever again spoke of Emmett Presley's sexual abuse, he would suffer worse consequences.

314.    John Doe 21was a minor resident of The Lord's Ranch from approximately 2008 to 2009. While a minor resident, John Doe 21 was sexually abused in the Ogden House by a staff member John Doe 21 knew as "Mr. Herman." Mr. Herman not only sexually abused John Doe 21 directly, but also forced John Doe 21 another male child, referred to herein by his initials K.H., to engage in sexual activity with each other while Mr. Herman watched.

315.    Additionally, John Doe 21 alleges that staff member Gary Jackson exposed himself to John Doe 21 and other minor residents.

316.    John Doe 21 reported directly to Ted Suhl. He even told Suhl that he was contemplating suicide because of the abuse. According to John Doe 21, Suhl threatened him in response, telling John Doe 21 that he would never leave The Lord's Ranch if he attempted suicide and failed. John Doe 21 did not commit suicide and the abuse continued.

317.    John Doe 22 was a minor resident of The Lord's Ranch from approximately 1999 to 2002. While a minor resident, John Doe 22 was sexually abused by staff members Tyree Davis and Rick Reynolds on multiple occasions. The abuse included, but was not limited to, groping her vagina and buttocks. Oftentimes, Davis and Reynolds would first place John Doe 22 in restraints

before fondling and groping her between her legs.

318.    During and prior to John Doe 22's abuse, The Lord's Ranch Defendants were fully aware of similar incidents of abuse and complaints made by female staff members concerning Tyree Davis and Rick Reynolds, and yet did nothing to John Doe 22's sexual exploitation and assault. John Doe 22 recalls that her phone calls with her parents were strictly monitored to ensure that the abuse was not reported.

319.    John Doe 23 was a minor resident of The Lord's Ranch from approximately 2002 to 2003. While a minor resident, John Doe 23 was sexually abused by multiple staff members. His primary sexual abuser was Tyree Davis. The sexual abuse by Tyree Davis consisted of numerous acts of groping, fondling of genitalia, and oral copulation. John Doe 23 claims that Davis would also masturbate while John Doe 23 engaged in sex acts with other minor residents.

320.    A staff member named Stanley Jackson, who was close with Tyree Davis, was also present and also participated in some of John Doe 23's sexual abuse. Stanley Jackson also groped and fondled John Doe 23.

321.    Prior to and during the time John Doe 23's abuse, and at all relevant times, The Lord's Ranch Defendants were aware of the sexual threat posed by Tyree Davis and other staff members to children at the facility, yet the administration and the Suhl Family did nothing to prevent John Doe 23's abuse.

322.    John Doe 24 was a minor resident of The Lord's Ranch in approximately 2003. While a minor resident, John Doe 24 was sexually abused by multiple staff members. One staff member was Emmett Presley, who groped and fondled John Doe 24's genitals during drives in his car on numerous occasions.

323.    John Doe 24 alleges he was also sexually abused by a staff member in the Prince House that John Doe 24 knew as "Bob." According to John Doe 24, fought back on one occasion

127

and this perpetrator broke John Doe 24's arm. On at least one occasion, Philander Kirk was present and watched with pleasure while "Bob" sexually abused John Doe 24.

324.    John Doe 24, who was black, hoped that the black staff members might come to his aide and stop the sexual abuse, so he reported the sexual abuse to some of them. They did not help him; they pretended they did not believe him. The sexual abuse continued.

325.    John Doe 25 was a minor resident of The Lord's Ranch from approximately 2007 to 2008. While a minor resident, John Doe 25 was sexually exploited by a male staff member when she was approximately 13 years old. The abuse included, but was not limited to, being forced to remove her clothing and then to stand and bend over while the perpetrating staff member watched. The abuse involved other minor girls.

326.    Prior to and during John Doe 25's abuse, and at all relevant times, the Lord's Rach Defendants were aware of ongoing abuse and the sexual threat that this and other perpetrating staff members posed to children at the facility, yet the administration and the Suhl Family did nothing to prevent the abuse.

327.    To the contrary, the administration and the Suhl Family threatened John Doe 25 into silence, allowing abuses to continue. When John Doe 25 reported to Ted Suhl, she recalls that he threatened her access to family and the success of her pending adoption.

328.    John Doe 25 recalls, too, that her correspondences with her foster mother were strictly monitored to ensure that the abuse was not reported. John Doe 25 recalls that Shirley Suhl tore up her correspondences and threatened to impede her pending adoption.

329.    John Doe 26 was a minor resident of The Lord's Ranch from approximately 1987 to 1989. While a minor resident, John Doe 26 was sexually exploited by a senior male administrator, when he was approximately 14 to 15 years old. The abuse included but was not limited to being forced to sit on the perpetrating senior male administrator's lap and having his

legs, thighs, and genitals groped and fondled. The perpetrating senior male administrator threatened physical harm to John Doe 26 if he did not acquiesce and remain silent.

330. Prior to and during John Doe 26's abuse, and at all relevant times, the Lord's Rach Defendants were aware of ongoing abuse and the sexual threat that the perpetrating staff member posed to children at the facility, yet the administration and the Suhl Family did nothing to prevent the abuse.

331. John Doe 27 was a minor resident of The Lord's Ranch from approximately 2007 to 2008. While a minor resident, John Doe 27 was sexually exploited by a senior male administrator, when he was approximately 12 to 13 years old. The abuse included, but was not limited to, having his genitals groped and fondled. The perpetrating senior male administrator threatened physical harm to John Doe 27 if he did not acquiesce and remain silent.

332. Prior to and during John Doe 27's abuse, and at all relevant times, the Lord's Rach Defendants were aware of ongoing abuse and the sexual threat that the perpetrating staff member posed to children at the facility, yet the administration and the Suhl Family did nothing to prevent the abuse.

333. John Doe 28 was a minor resident of The Lord's Ranch from approximately 2005 to 2006. On at least one occasion, John Doe 28 was sexually abused by Emmett Presley in Emmett Presley's car after going for a drive.

334. John Doe 28 immediately told staff members Stan Jackson, Alonzo Giles, and others what Emmett Presley had done. These staff members immediately responded with threats and reprisals towards John Doe 28. The Lord's Ranch Defendants further threatened John Doe 28 that, if he ever again spoke of Emmett Presley's sexual abuse, he would suffer worse consequences.

335. John Doe 29 was a minor resident of The Lord's Ranch from approximately 2002

to 2005. While a minor resident, John Doe 29 was sexually exploited by a male staff member when she was approximately 14 to 15 years old. The abuse included, but was not limited to, repeated instances of groping and touching her vagina.

336.    Prior to and during John Doe 29's abuse, and at all relevant times, the Lord's Rach Defendants were aware of ongoing abuse and the sexual threat that this and other perpetrating staff members posed to children at the facility, yet the administration and the Suhl Family did nothing to prevent the abuse.

337.    John Doe 30 was a minor resident of The Lord's Ranch in and around 2003. On multiple occasions, he was sexually abused by Emmett Presley on The Lord's Ranch's premises and in Emmett Presley's car. The abuse included but was not limited to repeated instances wherein he was forced to engage in oral copulation and digital-anal penetration. Emmett Presley told him that the sex acts were godly and that they constituted a spiritual contract between John Doe 30 and Emmett Presley that would be violated were he ever to tell.

338.    Plaintiff John Doe 101 was a minor resident at the Lord's Ranch in approximately 2007. He was sexually abused as a minor by several Lord's Ranch staff members. The sexual abuse included, but was not limited to, a staff member exposing his penis to Plaintiff John Doe 101, fondling Plaintiff's genitals, and masturbating in front of Plaintiff while Plaintiff was forced to clean on his hands and knees.

339.    Staff would also put residents, including Plaintiff, into what was called a "Silent Room," a dark room with only a door and a very small window, where Lord's Ranch counselors and other residents would taunt and laugh at them.

340.    When Plaintiff would call home, he was limited to short phone calls, and there would always be several staff members present listening in on the calls.

341.    Plaintiff John Doe 102 was a minor resident at Lord's Ranch in approximately 2005. Plaintiff John Doe 102 was sexually abused on multiple occasions as a minor by staff members Philander Kirk and Gary Jackson.

342.    Plaintiff John Doe 103 was a minor resident at Lord's Ranch in or around 2006-2009. He was sexually abused by at least two staff members. The sexual abuse included, but is not limited to, groping, and fondling of Plaintiff John Doe 103's genitals on multiple occasions.

343.    Plaintiff John Doe 104 was a minor resident at Lord's Ranch in approximately 2006. He was repeatedly sexually abused by Defendant Emmett Presley, his counselor, as well as another staff member who worked in the Rachel House. The abuse perpetrated by Defendant Presley included, but was not limited to, forced oral sex.

344.    Plaintiff John Doe 104 reported the abuse to Lord's Ranch staff members Stan Jackson and Philander Kirk, who beat him up for making the report and warned him to never repeat it again.

345.    Plaintiff John Doe 105 was a minor resident at Lord's Ranch in 2006 and again in 2008. While at the Lord's Ranch, Plaintiff John Doe 105 was subjected to repeated physical abuse by staff members. Additionally, Plaintiff John Doe 105 was subjected to sexual abuse at the hands of other residents.

346.    Plaintiff John Doe 106 was a minor resident at Lord's Ranch in 2010. While at the Lord's Ranch, Plaintiff John Doe 106 was sexually abused by a staff member.

347.    Plaintiff John Doe 107 was a minor resident at the Lord's Ranch in approximately 1995 to 1997. While at the Lord's Ranch, Plaintiff John Doe 107 was sexually and physically abused on numerous occasions. One of the perpetrators of sexual abuse was a staff member "Larry Winebaker." Plaintiff John Doe 107 reported the abuse to staff members; however, no action was taken to protect him or hold the perpetrators accountable.

348.    Plaintiff John Doe 108 was sent to Lord's Ranch in or around 1991 and remained until 2001. While a minor resident of Lord's Ranch, he was sexually abused by multiple perpetrators including staff members Emmett Presley and Neil Evans. Plaintiff John Doe 108 reported the abuse he suffered at the hands of other residents to staff members at Lord's Ranch, but instead of finding relief and safety, staff members Defendant Emmett Presley and Neil Evans used the information to perpetrate their own sexual abuse against Plaintiff.

349.    Plaintiff John Doe 109 was sent to Lord's Ranch in the late 1990s. He demonstrated an interest in joining the military one day. As a minor, he was being given rides to and from military drills by an individual known to members of the Lord's Ranch to be a sexual offender and, upon information and belief, an agent of Lord's Ranch who would sexually abuse John Doe 109, threatening him to comply. In the alternative, while in the care of and as a resident of Lord's Ranch, agents of Lord's Ranch knowingly allowed Plaintiff John Doe 109 to be alone and the victim of sexual assault from an individual known to be a sexual predator or offender.

350.    Plaintiff John Doe 110 was a minor resident at Lord's Ranch in or around 1996 and remained until 1999. While a minor resident of the Lord's Ranch, John Doe 110 was sexually abused and intimidated by an employee of the Lord's Ranch named "Jeff." Other employees saw this sexual abuse take place or had it reported to them but took no action to prevent it from taking place. As time went on, John Doe 110 was sent to a private house where he would be seated with his hands tied behind his back where he would be physically assaulted, beaten, and left in the home.

351.    Plaintiff John Doe 111 was a minor resident at Lord's Ranch throughout the 1990s. While at the Lord's Ranch in approximately 1996 and 1997, John Doe 111 was sexually and physically abused by several staff members, including being transported by Lord's Ranch employee, Alonza Jiles, where John Doe 111 was sexually abused by another staff member.

352.    Plaintiff John Doe 112 was a minor resident at Lord's Ranch from approximately 1993 to 1999. While at the Lord's Ranch, John Doe 112 was subjected to repeated incidents of sexual and physical abuse by staff members. Plaintiff reported this abuse to Shirley Suhl on multiple occasions to no avail.

353.    Plaintiff John Doe 113 was a minor resident at Lord's ranch in around 2007. While at the Lord's Ranch, he was sexually assaulted by another resident. After the assault, Tompkins reported the assault to staff members who did not remove the assailant. As a result, Plaintiff Tompkins was repeatedly assaulted by the other resident again.

354.    Plaintiff Jane Doe 101 was a minor resident at Lord's Ranch in approximately 2004. While a minor resident of the Lord's Ranch, she was sexually abused by a staff member known as "Coach" who was also her teacher.  On numerous occasions and for his own sexual gratification, "Coach" would sexually grope Plaintiff Jane Doe 101, including but not limited to rubbing his erect penis on Plaintiff's back while moaning.

355.    Plaintiff Jane Doe 102 was a minor resident at the Lord's Ranch in approximately 2002 when she was sexually abused by two Lord's Ranch staff members. The sexual abuse included but was not limited to sexual molestation and rape.

356.    Plaintiff Jane Doe 103 was a minor resident at Lord's Ranch in approximately 2002. She was sexually abused by a staff member named Steven Marlowe.  Plaintiff Jane Doe 103 reported the sexual abuse to a staff member named "Mr. Jackson," but nothing was done.

357.    Plaintiff Jane Doe 104 was a minor resident at Lord's Ranch in approximately 2002-2003.  Plaintiff was physically and sexually abused by several staff members on multiple occasions, including two senior staff members. Plaintiff was around 13-14 years old at the time.

358.    Plaintiff Jane Doe 105 was a minor resident at Lord's Ranch in approximately 2002. Plaintiff Jane Doe 105 was sexually abused by multiple perpetrators including another female

resident, a male staff member, and a female staff member. The sexual abuse perpetrated included but was not limited to numerous incidents of abuse involving digital penetration, fondling, and groping.

359.    Plaintiff Jane Doe 106 was a minor resident at Lord's Ranch in approximately 2001. She was sexually abused by a staff member who repeatedly made sexually explicit comments and sexual advances and propositions to Plaintiff Jane Doe 106. Plaintiff Jane Doe 106 reported the sexual abuse to Defendant Shirley Suhl but was told there was "nothing she could do."

360.    Plaintiff Jane Doe 107 was a minor resident at Lord's Ranch from approximately 2003 to 2004. She was sexually abused by several staff members.

361.    Plaintiff Jamie Wells was a minor resident at the Lord's Ranch in approximately 2002 when she was sexually abused.  She was trafficked back and forth between the Lord's Ranch by several staff members. On a separate occasion that same year, Plaintiff's arm was broken by Lord's Ranch employee, Alonza Jiles, during a restraint hold while at the Lord's Ranch.

362.    Plaintiff Jane Doe 109 was a minor resident at Lord's Ranch in the 1990s for approximately 9 years. During that time, she was sexually and physically abused while at the Lord's Ranch by several staff members. Plaintiff Jane Doe 109's trauma was reported to a doctor at the Lord's Ranch, who failed to report the abuse to civil authorities and otherwise concealed the abuse.

363.    Prior to and during the abuses, and at all relevant times, the Lord's Rach Defendants were aware of ongoing abuse and the sexual threat that Emmett Presley posed to children at the facility, yet the administration and the Suhl Family did nothing to prevent the abuse.

364.    At all relevant times, it was well known amongst the residents and staff at The Lord's Ranch that Emmett Presley was regularly sexually abusing the children, and that he was

using his position of power and authority over the children to coerce them into compliance. As part of his grooming and coercion, Emmett Presley would buy gifts and clothing for his victims, food off campus, give them cigarettes, or allow them to drive his car. He would also give pornographic magazines to the boys. For boys that did not comply with his abuse and "the program," however, Emmett Presley would threaten to send them to jail, prevent them from going home, and/or limit or prevent their ability to call their parents.

365.    The Lord's Ranch staff such as Gary Jackson, Philander Kirk, and Tyree Davis would laugh, smile, or otherwise make jokes when residents were leaving to meet with Emmett Presley or were being dropped off with gifts after seeing him (an indicator the boy was sexually abused).

366.    Children at the Lord's lived in constant fear, knowing that they were alone in a remote, unfamiliar environment far from home and at the complete mercy of a sadistic staff. For many children, survival meant compliance with the physical and sexual abuse.

**E.  The Lord's Ranch Defendants Clearly Breached their Duty of Care.**

367.    At all times relevant to this complaint, The Lord's Ranch Defendants owned, operated, maintained, staffed, and supervised mental health counseling and education programs in Warm Springs, AR.

368.    At all relevant times, The Lord's Ranch Defendants, through their agents, employees, and officials, had control and supervisory authority over The Lord's Ranch's mental health counseling and education programs and over the staff and other agents administering the programs.

369.    At all relevant times, The Lord's Ranch Defendants had the power to hire, appoint, supervise, monitor, restrict and fire each person, including staff, working with residents in the

mental health counseling and education programs.

370.    At all times relevant, The Lord's Ranch's employees and agents staffed and operated the mental health counseling, education, and residential programs.  In doing so, The Lord's Ranch Defendants' agents and employees were required and authorized as part of their agency duties to interact with, mentor, supervise, and provide mental health counseling and reform to youths participating in the residential programs.

371.    All staff members of The Lord's Ranch were charged with, among other tasks, the supervision and monitoring of the residents at The Lord's Ranch, including Plaintiffs.

372.    The Lord's Ranch Defendants had a duty to supervise its staff members during their respective employment with The Lord's Ranch.

373.    At all times relevant, the staff members of The Lord's Ranch were empowered by The Lord's Ranch to run and operate the facilities. In doing so, the staff were expected to interact with, mentor, supervise, educate, and oversee the residents, including the Plaintiffs.

374.    The staff at The Lord's Ranch used their positions of power and authority vested in them by The Lord's Ranch to sexually and psychologically abuse children residing at The Lord's Ranch, including these Plaintiffs.

375.    As a direct and proximate result of the wrongful acts and omissions of Defendants, as described herein, Plaintiffs have suffered and continue to suffer injuries and damages, including without limitation severe pain and suffering of body and mind; shock; severe and permanent emotional distress; physical manifestations of the aforesaid emotional distress; terror; embarrassment; loss of self-esteem; disgrace; humiliation; and loss of enjoyment of life; have sustained and will continue to sustain lost education, loss of earnings, and lost earning capacity; and have incurred and will continue to incur severe psychological injury and incur expenses for

medical and psychological treatment, therapy and counseling.

## CAUSES OF ACTION
## COUNT ONE – NEGLIGENT SUPERVISION
**(All Plaintiffs vs. The Lord's Ranch Defendants)**

376.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

377.    Negligent supervision and retention hinges on the element of foreseeability.  Where there is foreseeability, employers have a duty to control an employee for the protection of third parties even where the employee is acting outside the scope of employment. *Regions Bank & Trust v. Stone County Skilled Nursing Facility, Inc.* 345 Ark. 555, 568, 49 S.W.3d 107, 115 (2001). The sexual abuse and exploitation of these Plaintiffs was foreseeable to The Lord's Ranch Defendants, and they had a duty to control and supervise their employees and agents for the protection of Plaintiffs.  It is "not necessary that the employer foresee the particular injury that occurred, but only that the employer reasonably foresee an appreciable risk of harm to others." *Saine v. Comcast Cable Vision of Arkansas, Inc.*, 354 Ark. 492, 126 S.W.3d 339 (2003).

378.    In this case, the exploitation and abuse suffered by Plaintiffs was specifically foreseeable to The Lord's Ranch Defendants. As detailed in preceding sections herein, The Lord's Ranch Defendants were fully aware or should have been fully aware that the staff members, employees, and agents referenced herein were prone to sexually abusing residents, and they made the very conscious and intentional decision to allow these men to victimize these Plaintiffs despite their awareness.

379.    This negligent supervision was the proximate cause of Plaintiffs' injuries, their injuries being the natural and probable consequence of The Lord's Ranch Defendants' negligence.

380.    At all relevant times, The Lord's Ranch Defendants knew, or in the exercise of reasonable care should have known, that these abusive staff members presented a risk of danger to

Plaintiffs and other residents. See *Regions Bank & Trust*, 345 Ark. At 568, 49 S.W.3d at 113. *See also Saine,* 354 Ark. At 497, 126 S.W.3d at 342. Despite this, they did nothing to control these predators.

381.    The Lord's Ranch Defendants also failed to inform, educate, or train its staff in how to identify, prevent or respond to incidents of child sexual abuse; warn residents in their programs (and their parents and legal guardians) about this known danger; implement reasonable and feasible child abuse prevention policies; alert authorities to the nature and scope of this known danger, as required by law; investigate any reports of staff misconduct; or fire, discipline, or remove abusive staff members, or otherwise prevent them from accessing Plaintiffs on or off the grounds.

382.    As a result of the authority vested in him by The Lord's Ranch Defendants, Plaintiffs were conditioned to trust staff, to comply with their directions, and to respect their authority. The Lord's Ranch Defendants placed Plaintiffs in this situation despite having known or having should have known of the continuing danger to Plaintiffs and other residents of The Lord's Ranch posed by these abusive staff members.

383.    Moreover, at all relevant times, The Lord's Ranch Defendants actively misled the public, parents, guardians, and administrators from child services agencies regarding the quality and trustworthiness of the staff at The Lord's Ranch, and the serious dangers to its residents.

## COUNT TWO – NEGLIGENT RETENTION
### (All Plaintiffs vs. The Lord's Ranch Defendants)

384.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

385.    The Lord's Ranch Defendants were negligent in their retention of numerous abusive staff, including and particularly Emmett A. Presley, but also the other staff members referenced herein. This negligence was a proximate cause of Plaintiffs' damages described in this Complaint. The Lord's Ranch Defendants knew or in the exercise of reasonable care should have

known that Emmet Presley, Tyree Davis, and other staff subjected Plaintiffs and other residents to an unreasonable risk of harm.

386.    For the reasons described throughout this Complaint, The Lord's Ranch Defendants' decision to continue to retain abusive staff for as long as they did, despite their knowledge of the dangers they presented to Plaintiffs, was negligent and a proximate cause of Plaintiffs' damages.

## COUNT THREE – NEGLIGENCE
### (All Plaintiffs vs. all Defendants)

387.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

388.    At all relevant times, Defendants owed a duty of care to Plaintiffs, as described herein.

389.    This duty included a duty not to subject Plaintiffs to an unreasonable risk of harm.

390.    At all relevant times hereto, Defendants and their agents were required to consider Plaintiffs' capacity to care for themselves and to protect them from foreseeable dangers, including those created by their conditions as vulnerable minors.

391.    At all times relevant hereto, Defendants owed a duty of ordinary care to the children in its facilities, including Plaintiffs.

392.    At all times relevant hereto, it was within the scope of Defendants' professional services to provide a safe environment to the children in residence at the facility.

393.    At all times relevant hereto, Defendants had a duty to protect the children in its residential programs from foreseeable harm.

394.    At all times relevant hereto, Defendants had a duty to supervise the minors residing at The Lord's Ranch.

395.    At all relevant times hereto, Defendants and their agents had a duty to furnish the care and attention reasonably required by the children residing at the facility.

396.    At all relevant times hereto, Defendants and their agents had a duty to not mislead the public, parents, guardians, and administrators from child service agencies regarding the dangers at The Lord's Ranch.

397.    Defendants breached their duties to Plaintiffs.

398.    Defendants' breach of these duties was a proximate cause of Plaintiffs' injuries.

399.    The harm suffered by Plaintiffs was foreseeable to Defendants, and they knew or should have known that Emmett Presley and the other abusive staff presented an unreasonable risk of harm to Plaintiffs.

400.    At all relevant times hereto, The Lord's Ranch Defendants, as well as staff and agents, had statutory and common law duties to monitor the welfare of the children in the counseling and residential facilities and to report any suspected abuse or neglect of such children to authorities.

401.    At all relevant times hereto, Defendants' staff and agents were mandated reporters, as defined in the Arkansas Child Maltreatment Act.

402.    The Lord's Ranch Defendants and its agents failed to report reasonable suspicions of child maltreatment.

403.    Defendants failed to establish clear boundaries and codes of conduct to be observed by staff when interacting with minor residents.

404.    Defendants failed to put in place policies and protocols to keep Plaintiffs and others in the facilities safe from sexual predation.

405.    Defendants failed to discipline instances of sexual abuse such that they established and fostered a culture of sexual exploitation amongst staff and residents.

406.    Defendants failed to notify minor residents or their guardians of the known danger.

407.    In addition to knowingly exposing Plaintiffs and others to sexual predators, Defendants failed to inform, educate, or train its staff in how to identify, prevent or respond to incidents of child sexual abuse; warn children in their programs (and their parents and guardians) about this known danger; implement reasonable and feasible child abuse prevention policies; alert authorities to the nature and scope of this known danger, as required by law as a mandatory reporter; investigate any reports of staff misconduct; supervise youths participating in facility programs; or fire, discipline, or remove abusive staff or otherwise prevent them from accessing Plaintiffs. As a result, abusive staff sexually abused these Plaintiffs and others.

408.    For all of the reasons described herein, Defendants breached their duties to Plaintiffs.  As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered injuries and damages.

## COUNT FOUR – NEGLIGENT PATIENT CARE
### (All Plaintiffs vs. All Defendants)

409.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

410.    At all relevant times, Defendants had a duty to supervise Plaintiffs, and the other minor residents in their care, as described herein.

411.    The theory of negligent patient care hinges on the relationship between the care provider and the patient. *Regions Bank & Tr. v. Stone Cty. Skilled Nursing Facility, Inc.,* 345 Ark. 555, 564, 49 S.W.3d 107, 112-113 (2001) (quoting *Niece v. Elmview Grp. Home*, 131 Wash. 2d 39, 929 P.2d 420 (1997)). The Lord's Ranch, as a care provider and mental counseling facility for juveniles, had a duty to supervise Plaintiffs, and all other minors in its care.

412.    A care facility is required to consider the patient's capacity to care for himself or

herself and to protect the patient from dangers created by his or her weakened condition. Providing a safe environment for patients is within the scope of the professional services of a facility like Defendants'. See *Sexton v. St. Paul Fire & Marine Ins. Co.* 275 Ark. 361, 631 S.W.2d 270 (1982). Arranging for a safe environment for residents and patients of a mental health counseling facility is well within the scope of the professional services of The Lord's Ranch Defendants. Therefore, Defendants were required to take Plaintiffs' capacity as minor children to care for themselves into account in their supervisory capacity.

413.    At all times relevant hereto, The Lord's Ranch represented itself as a mental counseling facility for troubled youth.

At all times relevant hereto, it was within the scope of The Lord's Ranch's professional services to provide a safe environment for the minor residents in its care.

414.    At all times relevant hereto, The Lord's Ranch failed to investigate complaints of sexual abuse and exploitation made by Plaintiffs and others against Emmett Presley and other staff, thereby failing to provide a safe environment for the children in its care.

415.    At all times relevant hereto, The Lord's Ranch, through its staff and agents, was aware of the sexual abuse and exploitation Plaintiffs were experiencing.

416.    The Lord's Ranch's failure to provide a safe environment for the children in its care was the proximate cause of Plaintiffs' injuries.

417.    For the reasons described throughout this Complaint, The Lord's Ranch's failure to provide a safe environment for the minors in its care was negligent and a proximate cause of Plaintiffs' injuries.

## COUNT FIVE – VICARIOUS LIABILITY FOR NEGLIGENT OR OTHERWISE TORTIOUS ACTS AND OMISSIONS OF ALL AGENTS AND EMPLOYEES
### (All Plaintiffs vs. The Lord's Ranch Defendants)

418.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

419.    The Lord's Ranch Defendants are vicariously liable for all acts and omissions of its agents and employees, including but not limited to Emmett Presley, Alonza Jiles, Gary Jackson, Ted Suhl, Bud Suhl, Shirley Suhl, Stephen Marlow, Philander Kirk, Tyree Davis, Stanley Jackson, Rick Reynolds, and including those as of yet unknown agents and employees, as described throughout this Complaint.

420.    As described herein, the known and unknown The Lord's Ranch Defendants' agents, employees, and representatives were all acting within the scope of their authority and employment when these breaches of duty occurred.

## COUNT SIX – TORT OF OUTRAGE
### (All Plaintiffs vs. All Defendants)

421.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

422.    Defendants willfully and wantonly engaged in extreme and outrageous conduct.

423.    Defendants' conduct, as described herein, proximately caused the injuries to Plaintiffs.

424.    Defendants betrayed the trust of Plaintiffs and the community in the most egregious manner, given the amount of evidence of danger posed by Emmett Presley and other abusive staff at The Lord's Ranch that Defendants systematically ignored and intentionally covered up for an unreasonably long period of time.

425.    Defendants' conduct was extreme, outrageous, and utterly intolerable in a civilized

community. Defendants conduct went beyond all possible bounds of decency.

## COUNT SEVEN – SEXUAL BATTERY
### (All Plaintiffs against The Lord's Ranch Defendants under vicarious liability)

426.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

427.    Employees and agents of The Lord's Ranch Defendants wrongfully, intentionally, and by force made harmful physical sexual contact with Plaintiffs, all minor children, without legal consent.

428.    These abuse staff members, employees, and agents were acting within the scope of their employment and authority, and for the benefit of The Lord's Ranch Defendants, and wielding the power of The Lord's Ranch Defendants when they sexually abused Plaintiffs.

429.    In the first alternative, acts within the course and scope of their employment led to or resulted in the sexual abuse.

430.    In the second alternative, their sexual abuse of Plaintiffs was aided by their agency for The Lord's Ranch Defendants.

431.    In the third alternative, The Lord's Ranch Defendants ratified their sexually abusive conduct towards Plaintiffs when it chose to retain them.

432.    In the fourth alternative, their tortious conduct, ostensibly, was committed in furtherance of The Lord's Ranch Defendants' goals.

433.    The battery was a proximate cause of Plaintiffs' injuries. As a direct result of the sexual battery, Plaintiffs have suffered injuries and damages in excess of the amount required for federal diversity jurisdiction.

## COUNT EIGHT
## CIVIL ACTION BY A CRIME VICTIM
### (All Plaintiffs vs. The Lord's Ranch Defendants)

434.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set

forth herein.

435.    The allegations contained herein meet the criminal statutory definition of Rape, as well as Sexual Assault in the First and Second Degrees. See A.C.A. § 5-14-103, § 5-14-124, and § 5-14-125.

436.    Each of these criminal acts gives Plaintiffs a civil cause of action pursuant to A.C.A. § 16-118-107.

437.    These crimes were a proximate cause of Plaintiffs' injuries. As a direct result of these crimes, Plaintiffs have suffered injuries and damages more than the amount required for federal diversity jurisdiction.

438.    Pursuant to A.C.A. § 16-118-107, Plaintiffs shall be entitled to recover their costs *and attorney fees* when they prevail on this cause of action.

## COUNT NINE
### (Joint Venture / Alter Ego / Single Entity Theory of Liability / Successor Liability)
### (All Plaintiffs vs. The Lord's Ranch Corporate Defendants)

439.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

440.    At all relevant times, Defendants TED E. SUHL, individually and d/b/a MAXUS, INC. d/b/a ARKANSAS COUNSELING ASSOCIATES INCORPORATED d/b/a TRINITY BEHAVIORAL HEALTHCARE SYSTEMS, INC. d/b/a THE LORD'S RANCH; MAXUS, INC., individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH; THE LORD'S RANCH CHRISTIAN BOY'S HOME, INC.; THE LORD'S RANCH CHRISTIAN CENTER AND CHILDREN'S REHABILITATION UNIT; THE LORD'S RANCH  PSYCHIATRIC UNIT, INC.; CHRISTIAN INTERNATIONAL MEDICAL SCIENCES FOUNDATION, INC.; CORNERSTONE TREATMENT CENTER, INC.; BURKLYN CORPORATION; GOOD

145

SAMARITAN REHABILITATION CENTER, INC.; WARM SPRINGS CHRISTIAN CENTER, INC.; TRINITY DYNAMICS, INCORPORATED; THE LORD'S RANCH BEHAVIORAL HEALTHCARE SYSTEM, INCORPORATED; TRIENNIA HEALTH CARE, INC.; HORIZON SUNRISE MANAGEMENT; MILLENIA HEALTH CARE, INC.; LG PROPERTY MANAGEMENT, INCORPORATED; GREEN VALLEY ASSET MANAGEMENT, LLC; ROLLING HILLS INVESTMENTS, LLC; REGAL PROPERTY DEVELOPMENT LLC; and their owners, including but not limited to TED SUHL and SHIRLEY SUHL (hereinafter referred to as "Lord's Ranch Corporate Defendants") acted as one business.

441.    At all relevant times, Lord's Ranch Corporate Defendants had the same principal place of business located at 1033 Old Burr Road, Warm Springs, Arkansas, including but not limited to:

      a.   Christian International Medical Sciences Foundation, Inc.;

      b.   Good Samaritan Rehabilitation Center, Inc.;

      c.   LG Property Management, Incorporated;

      d.   The Lord's Ranch Christan Boy's Home, Inc.;

      e.   The Lord's Ranch Christian Center and Children's Rehabilitation Unit;

      f.   Trinity Behavioral Health Care System, Incorporated.;

      g.   Horizon Sunrise Management;

      h.   Millenia Health Care Inc; and

      i.   Triennia Health Care Inc.

442.    At all relevant times, Lord's Ranch Corporate Defendants listed listed 1033 Old Burr Rd., Warm Springs, AR 72478 as their Registered Agent's address with the Arkansas Secretary of State's Office, including but not limited to:

      a.   Christian International Medical Sciences Foundation, Inc.;

    b.   Good Samaritan Rehabilitation Center, Inc.;

    c.   LG Property Management, Incorporated;

    d.   The Lord's Ranch Christan Boy's Home, Inc.;

    e.   The Lord's Ranch Christian Center and Children's Rehabilitation Unit;

    f.   Trinity Behavioral Health Care System, Incorporated.;

    g.   Horizon Sunrise Management;

    h.   Millenia Health Care Inc;

    i.   Triennia Health Care Inc.;

    j.   Cornerstone Treatment Center, Inc.;

    k.   Green Valley Asset Management, LLC;

    l.   The Lord's Ranch Psychiatric Unit, Inc.;

    m.  Rolling Hills Investments, LLC;

    n.   Trinity Dynamics Inc; and

    o.   Warm Springs Christian Center, Inc.

443.    At all relevant times, Lord's Ranch Corporate Defendants structure, operation and management was to act as a Joint Venture and Enterprise.

444.    At all relevant times, Lord's Ranch Corporate Defendants engaged in the same type of business, including but not limited to providing mental health and behavioral treatment to minors or adults or otherwise being involved in owning and operating the facilities.

445.    At all relevant times, Lord's Ranch Corporate Defendants were owned by the same individuals, namely, the Suhl family.

446.    At all relevant times, Lord's Ranch Corporate Defendants shared the same key managerial employees and decision makers.

447.    At all relevant times, the Suhl family, including Ted Suhl and Shirley Suhl, directed, governed, and controlled the Lord's Ranch Corporate Defendants' business operations, or had the right to direct, govern, and control the Lord's Ranch Corporate Defendants' business operations.

448.    For example, Ted Suhl has been listed as an officer or registered agent for nine of the Lord's Ranch Defendants.

449.    Ted Suhl was the highest-ranking officer of Maxus, Inc. (President), Regal Property Development LLC (Singular officer).

450.    Shirley Suhl was listed as an officer or registered agent for three of the Lord's Ranch Defendants.

451.    Bud Suhl is also listed as the original agent for the Lord's Ranch Christian Center and Children's Rehabilitation Unit.

452.    For each of the remaining entities who do not list the Suhls as Registered Agent or Officer with the Arkansas Secretary of State, they listed Joel P. Landreneau as the agent or the officer.

453.    Landreneau's address is listed as the exact same address as the Lord's Ranch property, 1033 Old Burr Rd., Warm Springs, AR 72478, which is also the same address for each entity which he was the agent or officer of, with the exception of the Burklyn Corporation.

454.    The Burklyn Corporation registered "The Lord's Ranch Maintenance Co." as a fictitious name for the entity with the Arkansas Secretary of State's Office.

455.    Upon information and belief, at all relevant times, Landreneau worked for the Suhl family defendants including Bud Suhl, Ted Suhl, and/or Shirley Suhl.

456.    At all relevant times, each of the Lord's Ranch Defendants are or were operating out of the Lord's Ranch property and utilizing the same affiliates or agents during the time that the

148

egregious abuses in this case occurred.

457.    Upon information and belief, at all relevant times, the Lord's Ranch Corporate Defendants shared in the profits or losses of these ventures, or otherwise comingled funds.

458.    At all relevant times, one of the primary reasons the Suhl family defendants created the Lord's Ranch Corporate Defendants as separate individual companies, even though they were operating as one company and for the benefit of the same owners, was to attempt to limit liability and insulate and minimize exposure if ever sued.

459.    At all relevant times, one of the primary reasons the Suhl family defendants created the Lord's Ranch Corporate Defendants as separate individual companies, even though they were operating as one company and for the benefit of the same owners, was to attempt to hide assets or otherwise protect assets in case the federal, state and/or local government pursued criminal charges against Suhl Defendants and some of their companies, ordering restitution, reimbursement, or financial penalties for financial fraud or other misconduct.

460.    The creation of the joint venture was intended to avoid and evade monetary liabilities for negligent, reckless, and/or willful and wanton conduct.

461.    The creation and practice of the Lord's Ranch Corporate Defendants' joint venture promotes injustice and inequitable circumstances for Plaintiffs.

462.    Lord's Ranch Corporate Defendants engaged in a joint venture and as such, they each share in and are responsible for the liability to Plaintiffs for the negligent, reckless and/or willful and wanton acts and omissions detailed above.

463.    Upon information and belief, at all relevant times, Lord's Ranch Corporate Defendants failed to maintain adequate meeting minutes when the owners and managerial employees had meetings to discuss their shared business interests, operation, and management.

464.    At all relevant times, the Lord's Ranch Corporate Defendants failed to maintain an

arm's length relationship between one another and their businesses.

465.    At all relevant times, Lord's Ranch Corporate Defendants were mere alter egos of one another.

466.    Because Lord's Ranch Corporate Defendants were mere alter-egos of one another, Lord's Ranch Corporate Defendants are liable to Plaintiffs for the debts and liabilities of each other, including any and all judgments rendered against Defendants TED E. SUHL, individually and d/b/a MAXUS, INC. d/b/a ARKANSAS COUNSELING ASSOCIATES INCORPORATED d/b/a TRINITY BEHAVIORAL HEALTHCARE SYSTEMS, INC. d/b/a THE LORD'S RANCH; MAXUS, INC., individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH; THE LORD'S RANCH CHRISTIAN BOY'S HOME, INC.; THE LORD'S RANCH CHRISTIAN CENTER AND CHILDREN'S REHABILITATION UNIT; THE LORD'S RANCH PSYCHIATRIC UNIT, INC.; CHRISTIAN INTERNATIONAL MEDICAL SCIENCES FOUNDATION, INC.; CORNERSTONE TREATMENT CENTER, INC.; BURKLYN CORPORATION; GOOD SAMARITAN REHABILITATION CENTER, INC.; WARM SPRINGS CHRISTIAN CENTER, INC.; TRINITY DYNAMICS, INCORPORATED; THE LORD'S RANCH BEHAVIORAL HEALTHCARE SYSTEM, INCORPORATED; TRIENNIA HEALTH CARE, INC.; HORIZON SUNRISE MANAGEMENT; MILLENIA HEALTH CARE, INC.; LG PROPERTY MANAGEMENT, INCORPORATED; GREEN VALLEY ASSET MANAGEMENT, LLC; ROLLING HILLS INVESTMENTS, LLC; REGAL PROPERTY DEVELOPMENT LLC; and/or TED or SHIRLEY SUHL.

467.    In the alternative, at all relevant times, Lord's Ranch Corporate Defendants and its agents and employees acted as actual or apparent agents of TED E. SUHL, SHIRLEY SUHL, MAXUS, INC., individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL

HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH, and THE LORD'S RANCH, and thus the Lord's Ranch Corporate Defendants are all liable for TED E. SUHL, SHIRLEY SUHL, MAXUS, INC., individually and d/b/a THE LORD's RANCH; TRINITY BEHAVIORAL HEALTH CARE SYSTEM, INCORPORATED, individually and d/b/a THE LORD'S RANCH, and their employees and/or agent's negligent, reckless, and/or willful or wanton acts and/or omissions under agency principles.

468.    In sum, pleading in the alternative, as a result of their participation in various joint adventures, alter ego, single entity purpose and operation, and/or successor corporations, Lord's Ranch Corporate Defendants are liable to Plaintiffs.

## DAMAGES

469.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

470.    As a direct result of the Defendants' conduct described herein, Plaintiffs have suffered severe sexual, physical, and psychological abuse, causing severe and permanent injuries and damages. Those injuries and damages include but are not limited to:

    a.  Severe pain and suffering, including emotional distress and mental anguish, past and future;

    b.  Severe and permanent psychological injuries, including but not limited to depression, PTST, anxiety disorders, substance abuse disorders, intimacy and sexual disorders, loss of self-esteem, shame, and humiliation;

    c.  past and future medical expenses, as well as the costs associated with past and future life care; and

    d.  past and future lost wages and loss of earning capacity.

471.    Plaintiffs were prevented and will continue to be prevented from obtaining the full enjoyment of life; they will continue to incur expenses for medical and psychological treatment,

therapy, and counseling.

## AMOUNT OF DAMAGES

472.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

473.    Plaintiffs' injuries and damages are in excess of the minimum amount required for federal court jurisdiction in diversity of citizenship cases, for which Plaintiffs should be awarded a judgment as against Defendants in an amount to compensate them fully and fairly for each and every element of damages they have suffered.

## PUNITIVE DAMAGES

474.    Plaintiffs hereby incorporate by reference all previous paragraphs as if fully set forth herein.

475.    The Lord's Ranch Defendants knew its staff presented an unreasonably high risk of sexual abuse to Plaintiffs.  As described with particularity herein, Defendants and its agents knew about the abuse Plaintiffs suffered at the hands of Emmett Presley and other staff members, and they consciously made the decision not to act. Defendants knew that their systematic refusal to take any steps whatsoever to protect Plaintiffs would certainly result in the continued sexual abuse of Plaintiffs and the other residents. But The Lord's Ranch Defendants, including Ted Suhl and Shirley Suhl, did not just fail to act to prevent further abuses by Presley and others, they also made the calculated decision to allow sexually abusive staff to continue to sexually abuse these children, and they achieved this through threats, intimidation, and violence; the Suhl Family and their underlings were nothing short of ruthless in their efforts to protect Presley and his habitual sexual abuse of the teenage boys in their care, as well as the habitual acts of sexual abuse being committed by several other agents and employees. Therefore, Defendants' conduct can only be described as willful and wanton, and in reckless disregard of the consequences. The Lord's Ranch

Defendants displayed a conscious indifference to the rights, safety, and welfare of Plaintiffs, and they should be punished to the fullest extent possible under the law.

476.    The Lord's Ranch Defendants betrayed the trust of Plaintiffs and the community in the most egregious manner, given the evidence of the danger posed by its staff, and Presley in particular, that it systematically ignored for an unreasonably long period of time. The Lord's Ranch Defendants' conduct was extreme, outrageous, and utterly intolerable in a civilized community. Its conduct went beyond all possible bounds of decency.

477.    Plaintiffs are seeking punitive damages to punish these Defendants, and to deter similar facilities and individuals from engaging in this depraved conduct.

## JURY DEMAND

478.    Plaintiffs respectfully demand a trial by jury as to all matters so triable, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## RESERVATION OF ADDITIONAL CLAIMS

479.    Plaintiffs reserve the right to plead further upon completion of discovery to state additional claims and to name additional parties to this action.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs, by and through their undersigned attorneys, respectfully requests that a verdict or judgment is entered in their favor on all counts alleged, and against each and every named Defendant, separately and severally, and that damages are awarded to them in an amount which will adequately compensate Plaintiffs for the severe and permanent injuries and damages they sustained due to the Defendants' wrongful conduct, as well as award punitive damages against Defendants in order to punish their horrific misconduct and to deter future misconduct and abuse of children. Plaintiffs are seeking recovery for:

    a.  All available compensatory damages for the described losses with respect to each cause of action;

b.  past and future medical expenses, as well as the costs associated with past and future life care;

c.  past and future lost wages and loss of earning capacity;

d.  past and future emotional distress;

e.  consequential and/or special damages;

f.  all available noneconomic damages, including without limitation pain, suffering, and loss of enjoyment of life;

g.  disgorgement of profits obtained through unjust enrichment;

h.  restitution;

i.  punitive damages with respect to each cause of action;

j.  attorneys' fees and case costs, including fees and costs recoverable pursuant to 42 U.S.C. § 1988(b);

k.  pre- and post-judgment interest and all other interest recoverable; and

l.  all other damages and compensation available and recoverable under state and federal law, and for any further relief this Court deems equitable and just.

Dated: May 7, 2025                                Respectfully Submitted,

**GILLISPIE LAW FIRM**                            **STINAR GOULD GRIECO**
Joshua D. Gillispie                               **& HENSLEY, PLLC**
1 Riverfront Place, Suite 605                     Martin D. Gould
North Little Rock, AR 72114                       Parker Stinar
Phone: (501) 244-0700                             Nicholas P. Wainwright
Fax: (501) 244-2020                               101 N. Wacker Dr., Ste. 100
josh@gillispielawfirm.com                         T: (313) 895-7227
                                                  F: (313) 221-9550
By: _/s/ *Joshua D. Gillispie*                    Martin@sgghlaw.com
    Joshua D. Gillispie                           Nicholas@sgghlaw.com
    *Counsel for Plaintiffs*
    *John Does 1-8; 9-16; & 19-30*                By: _/s/ *Martin D. Gould*
                                                      Martin D. Gould
                                                      *Counsel for Plaintiffs John Does 7-8, 12,*
                                                      *101-107, 108-113; and Jane Does 101-109*

**ROMANUCCI & BLANDIN, LLC**                      **PAUL BYRD LAW FIRM, PLLC**
Stephan Blandin (*Pro Hac Vice*)                  415 N. McKinley St., Suite 210
Jason Friedl (*Pro Hac Vice*)                     Little Rock, AR 72205
Daisy Ayllon (*Pro Hac Vice*)                     Phone: (501) 240-3050
321 N. Clark Street, Suite 900                    Fax: (501) 420-3128
Chicago, IL 60654                                 Paul@paulbyrdlawfirm.com
Phone: (312) 458-1000
Fax: (312) 458-1004                               By: _/s/ *Paul Byrd*
*jfriedl@rblaw.net*                                   Paul Byrd, Ark. Bar No. 85020
                                                      *Counsel for Plaintiffs*
By: _/s/ *Jason Friedl*                                *John and Jane Does 101-107*
    Jason Friedl
    *Counsel for Plaintiffs*
    *John Does 1-8; 9-16; & 19-30*

**ONDER LAW, LLC**
James G. Onder (*Pro Hac Vice* application
forthcoming)
Cynthia L. Garber (*Pro Hac Vice* application
forthcoming)
Kayla Onder (*Pro Hac Vice* application
forthcoming)
110 East Lockwood
St. Louis, MO 63119
Tel: (314) 963-9000
Fax: (314) 227-7665
onder@onderlaw.com
garber@onderlaw.com
konder@onderlaw.com
*Counsel for Plaintiffs*
*John and Jane Does 101-107*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the Court's

ECF system which sent notification of such filing to the following:


Jay Bequette, Ark. Bar No. 87012
Phillip M. Brick, Jr., Ark. Bar No. 2009116
BEQUETTE, BILLINGSLEY & KEES, P.A.
425 West Capitol Avenue, Suite 3200
Little Rock, AR 72201-3469
Telephone: (501) 374-1107
Fax: (501) 374-5092
Email: jbequette@bbpalaw.com
Email: pbrick@bbpalaw.com

*Attorneys for Separate Defendants Emmett A. Presley and Alonza Jiles*

Stuart Miller
John Alexander
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
4206 South J.B. Hunt Drive, Suite 200
Rogers, Arkansas 72758
Direct: (479) 464-5670
Facsimile: (479) 464-5680
smiller@mwlaw.com
jalexander@mwlaw.com


Michael J. Scotti
ROETZEL & ANDRESS, LPA
30 N. LaSalle Street, Suite 2800 Chicago, IL 60602
Phone: 312.580.1200
mscotti@ralaw.com

*Attorneys for Separate Defendants "Suhl Defendants"*


                                        /s/ Joshus Gillispie_____
                                        Attorney for Plaintiffs

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF ARKANSAS,
### NORTHERN DIVISION

JOHN DOES 1-8, 9-16, 19-25, 27-30,
JOHN DOES 101-113 and
JANE DOES 101-109, *et. al.*,

        Plaintiffs,

v.

EMMETT A. PRESLEY; TED E. SUHL,
individually and d/b/a MAXUS, INC. d/b/a
ARKANSAS COUNSELING ASSOCIATES
INCORPORATED d/b/a TRINITY
BEHAVIORAL HEALTHCARE SYSTEMS,
INC. d/b/a THE LORD'S RANCH; MAXUS,
INC., individually and d/b/a THE LORD's
RANCH; TRINITY BEHAVIORAL HEALTH
CARE SYSTEM, INCORPORATED, individually
and d/b/a THE LORD'S RANCH; THE LORD'S
RANCH CHRISTIAN BOY'S HOME, INC.; THE
LORD'S RANCH CHRISTIAN CENTER AND
CHILDREN'S REHABILITATION UNIT; THE
LORD'S RANCH PSYCHIATRIC UNIT, INC.;
CHRISTIAN INTERNATIONAL MEDICAL
SCIENCES FOUNDATION, INC.;
CORNERSTONE TREATMENT CENTER, INC.;
BURKLYN CORPORATION; GOOD
SAMARITAN REHABILITATION CENTER,
INC.; WARM SPRINGS CHRISTIAN
CENTER, INC.; TRINITY DYNAMICS,
INCORPORATED; THE LORD'S RANCH
BEHAVIORAL HEALTHCARE SYSTEM,
INCORPORATED; TRIENNIA HEALTH CARE,
INC.; HORIZON SUNRISE MANAGEMENT;
MILLENIA HEALTH CARE, INC.; LG
PROPERTY MANAGEMENT,
INCORPORATED; GREEN VALLEY ASSET
MANAGEMENT, LLC; ROLLING HILLS
INVESTMENTS, LLC; REGAL PROPERTY
DEVELOPMENT LLC; SHIRLEY SUHL;

Case No.: **3:23-cv-230-DPM**
**(lead consolidated complaint)**

Consolidated Complaints per Court
Order: Case No. 3:23-cv-230-DPM; Case
No. 3:24-cv-3-DPM; Case No. 3:24-cv-
12-DPM; Case No. 3:24-cv-13-DPM;
Case No. 3:24-cv-14-DPM.

**Plaintiffs demand a jury trial**



ALONZA JILES; TYREE DAVIS; and JOHN
DOE DEFENDANTS 1–10,

                    Defendants.

### AFFIDAVIT OF PLAINTIFFS' ATTORNEY
### PURSUANT TO ACA 16-56-125

COMES NOW AFFIANT, Joshua D. Gillispie, and hereby swears and affirms as follows to

the best of his knowledge, information, and memory:

I hereby attest that Plaintiff is unaware of the identities of the John Doe Defendants 1-10.  To

the extent that such John Doe tortfeasor(s) are liable for some or all of Plaintiffs' damages, the identity

of said tortfeasor(s) has not been determined as of this date and it is necessary to conduct discovery in

order to determine the identity of said tortfeasor(s). If a John Doe Tortfeasor is identified for one or

more causes of action, Plaintiff will amend this Complaint in accordance with Ark. Code Ann. 16-56-

125.

_____          Joshua Gillispie
SIGNATURE                          PRINTED NAME

_____
DATE    5/7/25

### ACKNOWLEDGMENT

On this day, personally appeared before me Joshua D. Gillispie, known to me to be the person
whose name is subscribed to the within instrument, and acknowledged that he executed the same for
the purposes therein contained.  WITNESS my hand and official seal, this 7th day of May, 2025.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:

7-6-26

DANA E. HENDERSON
COMM. EXP.
7-06-2026
No. 12698310
LONOKE
COUNTY
NOTARY PUBLIC - ARKANSAS

2