# EXHIBIT 31
# 2026.05.14 Deposition of Steve Candelario

# In the Matter Of:

JOHN DOES 1,4 & 6, M. ROBINSON and M. COLLINS, vs EMMETT A. PRESLEY, et al.,

3:23-cv-230-DPM

---

## STEVE CANDELARIO

May 14, 2026

---



COALITION
Court Reporters

THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

NORTHERN DIVISION


JOHN DOES 1,4, & 6;            )
MICHAEL ROBINSON;             )
and MAURICE COLLINS,          )
                              )
          Plaintiffs,   )
                              )
          VS.           )CASE NO 3:23-cv-230-DPM
                              )
EMMETT A. PRESLEY, et al.,    )
                              )
          Defendants.   )
                              )
                              )
AND ALL RELATED ACTIONS.      )
_____)

**ORIGINAL**


DEPOSITION OF STEVE CANDELARIO

Los Angeles, California

Thursday, May 14, 2026


STENOGRAPHICALLY REPORTED BY:
HEATHERLYNN GONZALEZ
CSR #13646

Page 2

THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF ARKANSAS

NORTHERN DIVISION

JOHN DOES 1,4, & 6;          )
MICHAEL ROBINSON;            )
and MAURICE COLLINS,         )
                             )
          Plaintiffs,        )
                             )
          VS.                )CASE NO 3:23-cv-230-DPM
                             )
EMMETT A. PRESLEY, et al.,   )
                             )
          Defendants.        )
                             )
                             )
AND ALL RELATED ACTIONS.     )
_____)

          DEPOSITION OF STEVE CANDELARIO, taken on behalf of plaintiffs, at 5855 West Century Boulevard, Los Angeles, California 90045, commencing at 9:30 a.m. on Thursday, May 14, 2026, before Heatherlynn Gonzalez, CSR No. 13646, a Certified Shorthand Reporter within and for the State of California, pursuant to Notice.

Page 3

APPEARANCES OF COUNSEL

FOR THE PLAINTIFFS DOE GROUP 1:

     ROMANUCCI BLANDIN LAW
     BY:  PATRICK A. HUBER, ESQ.
     phuber@rblaw.net
     321 North Clark Street, Suite 900
     (312) 253-8790

FOR THE PLAINTIFFS DOE GROUP 2:

     GOULD, GRIECO, & HENSLEY
     BY:  NICHOLAS WAINWRIGHT, ESQ.
     Nicholas@GGHLaw.com
     1 North Franklin, Suite 3500
     Chicago, Illinois 60606
     (716) 790-1265

FOR ALL DEFENDANTS NOT OTHERWISE REPRESENTED:

     MITCHELL WILLIAMS
     BY:  STUART P. MILLER, ESQ.
     smiller@mwlaw.com
     4206 South JB Hunt Drive, Suite 200
     Rogers, Arkansas 72758
     (479) 464-5670

ALSO PRESENT:
     PHILLIP BRICK
     (APPEARING VIA ZOOM)

     MICHAEL SCOTTI
     (APPEARING VIA ZOOM)
     PAUL BYRD
     (APPEARING VIA ZOOM)

     DANA HENDERSON
     (APPEARING VIA ZOOM)
     TRAVIS SIMMONS
     LEGAL VIDEO SPECIALIST

Page 4

I N D E X

WITNESSES

ALL WITNESSES:                          PAGE:
  STEVE CANDELARIO
     Examination by ATTORNEY HUBER
                                        7:15
     Examination by ATTORNEY WAINWRIGHT
                                        157:12
     Examination by ATTORNEY MILLER
                                        160:18
     Further Examination by ATTORNEY HUBER
                                        246:6

EXHIBITS

NO.:    DESCRIPTION:                    PAGE:
Exh 1   Fax with cover sheet dated 1/31/94 addressed to Curtis Goodrich from Steve Candelario.
                                        35:2
Exh 2   Printout of article written by Mary Jacoby entitled "It's Not Child's Play."
                                        60:21
Exh 3   Document on Arkansas Department of Human Services Division of Children and Family Services letterhead titled "Follow-up with Child Maltreatment Reporter."
                                        109:1
Exh 4   Photocopy of handwritten notes on yellow pad.
                                        120:17
Exh 5   Document titled "Directory."
                                        127:5
Exh 6   Document addressed to Roy Kindle, Director of Children and Family Services from Steve Candelario dated 3-14-06.
                                        129:5
Exh 7   Fax sent to Mayor Gary Crocker from Steve Candelario on 3-15-06.
                                        138:14

Page 5

EXHIBITS (CONTINUED)

Exh 8   Email sent from Steven Candelario to infoasp.arkansas.gov with subject:  The Lord's Ranch.
                                        144:7
Exh 9   Document titled "Legislators Question Director of Northeast Arkansas Youth Ranch."
                                        146:25
Exh 10  Printout of webpages from Lord's Ranch website.
                                        148:16
Exh 11  A printout of an email from Steve Candelario to Steve Candelario dated 5-5-26.
                                        150:15
Exh 12  Printout of email from Mason Mason to Ryan Hobbs on May 23, 2022.
                                        151:17
Exh 13  Printout of email correspondence between Steve Candelario and others.
                                        189:2

Page 86

trying to get rid of him. He said that Emmett was very close friends with Bud, and so every time he would try to convince Bud to get rid of him, Bud would say no. He didn't say specifically why, you know, he was saying that. But, you know, he just was not liking him and he just told me to stay away from him.

And that one time that I did see him off to the side, it was that one time and that was it. I never saw him the rest of the time I was there.

Q Did you ever come to learn why Alonza Jiles did not like Emmett Presley?

A No. No.

Q Did you ever learn anything else about Emmett Presley?

A No.

Q Did you ever discuss compensation for the counselor position at the Lord's Ranch?

A As a regular salary, no. That was never spoken about.

Q Outside of a regular salary, did you discuss compensation for the counselor position?

A Yes.

Q And what did you learn about compensation?

A I was told by Alonza that there was an

Page 87

account that they would set up for me. They would give me $5,000. I would -- they would take the $5,000 and put it into a Cayman Islands account. And then in six months, they would give me another $5,000. So that was -- that was the only thing I heard in regards to something outside of pay.

I never really had a conversation the first week about pay. I didn't really ask. It's not -- I wasn't asking is it seven bucks an hour? Or how did they even do the pay. I figured if I did come back, I guess that would all be worked out because my housing is free, the food is free, whatever moneys they would be giving me, I guess, would just be moneys that went into my pocket. And I didn't really have any bills at that time.

Q When did you have the conversation with Alonza about compensation?

A I would say perhaps the fourth or fifth day in. I don't recall what day, specifically. But it was later in the week. It wasn't at the beginning of the week.

Q Okay. Where did this conversation occur?

A In front of the admin buildings. In front of the admin area. You know, where the admin officers are at, we were standing out in front of

Page 88

that --

Q So --

A -- outside.

Q So are you referring to the location in between the cafeteria and the main house?

A Correct.

Q So that's near the office?

A Correct.

Q Okay. Was anyone else present for this conversation?

A No. It was just he and I.

Q You mentioned that he told you that they would set up a bank account for you in the Cayman Islands; is that correct?

ATTORNEY MILLER: Form.

THE WITNESS: Correct.

BY ATTORNEY HUBER:

Q And you understood -- sorry. Let me ask that a different way.

What else did you learn about compensation for the counselor position?

A That was basically it.

Q Okay. Would the Lord's Ranch also provide a living stipend?

A We never -- I never had that conversation

Page 89

with them.

Q Okay.

A Yeah.

Q Did you ask any details about this Cayman Islands bank account that they would set up for you?

A I asked Alonza. I said: Why would they put money for me in a bank? You know?

He says: Well, you know, because we want to set up, like, a savings for you. We want to make sure you have money in there and it's a great way for you to build up moneys for yourself. And this is our way of giving you money.

Q Did Alonza say anything about why the account would be a foreign bank account in the Cayman Islands?

A No.

Q Did he tell you about whether other employees had Cayman Islands bank accounts?

A No.

Q Did you come to learn that anyone else at the Lord's Ranch had money in foreign bank accounts?

A No.

ATTORNEY MILLER: Form.

THE WITNESS: No.

BY ATTORNEY HUBER:

Page 90

Q   Did Alonza tell you anything about taxes?

A   No.

Q   Okay.  Do you know the individual who was responsible for setting up these foreign bank accounts in the Cayman Islands?

A   There was a gentlemen that would visit the Ranch, and he would set up the accounts with whoever it was that he was setting them up for.  It was a young man in his early 30's.  Blonde hair.  That's all I remember.  That was just the gentlemen that I saw that would come into the Ranch to talk about that.

Q   How did you come to learn that there was -- that this young individual that --

A   Alonza told me.

Q   Alonza told you --

A   He pointed him out to me.

Q   Okay.

A   Because one day the gentleman had visited and he said that that's the gentlemen that sets up our accounts in the Cayman Islands.

Q   Do you know his name?

A   No.  It was too long ago.

Q   Did you introduce yourself to this individual?

Page 91

A   No.

Q   Okay.

A   He just pointed him out to me.

Q   Could you tell us anything else about what he looked like?

A   Young man.  You know, early 30's.  Blondish hair.  Skinny.  You know.  It was a long time ago, but, you know, that's basically what I remember.

Q   Okay.  Did the Lord's Ranch ever set up an account for you?

A   No.  Because I never came back.

Q   Did Alonza ever have conversations with you about whether you were fit to be around young children?

ATTORNEY MILLER:  Form.

THE WITNESS:  Fit, meaning?

BY ATTORNEY HUBER:

Q   I can ask it a different way.

A   Yeah.

Q   Did Alonza have conversations with you about whether you believed you were a good candidate to be around young children?

A   Yes.  He felt that I had a good rapport with the kids, and he felt that my rapport would fit better with the younger kids as opposed to the older

Page 92

kids.  I don't know if it had anything to do with my height, but he saw that my interactions with the younger kids was a little bit bet- -- you know, better from what he had experienced before.

Q   Okay.
Could you tell us a little bit about how your time at the Ranch came to an end?

A   The week ended, and I was supposed to just go back home.  I was supposed to come back.  I was supposed to be driven back by a gentlemen that was in California as well.  I don't know who that gentlemen was.  I think he was supposed to start there at the Ranch at the same time as me.  And I guess they maybe perhaps didn't want to pay for an airline ticket to fly me back; so they were going to have me drive back with this person that I don't know in a van.
And it didn't really sit well with me because, first of all, I didn't know who this guy was.  Didn't feel comfortable taking a long trip cross country with some random person in a van to come back to the Ranch, you know, to start my -- my work.  So I was going to pay for my own flight and just fly myself back had I accepted the position and went back.  I was going to just fly back on my own.

Q   Okay.  I'm a little confused now.  When you

Page 93

left the Ranch, you had a plane ticket back to Los Angeles; right?

A   Correct.  Yeah.

Q   And the Lord's Ranch paid for that plane ticket; correct?

A   Right.

Q   But separately, you're saying that if you had accepted the position, the plan was that somebody would drive you from California to Arkansas?

A   Correct.  In a van.

Q   And who communicated that to you?

A   Alonza.

Q   And you weren't -- you weren't happy with those arrangements?

A   No.

Q   So if you decided to come back, you had in mind that you would fly?

A   I would fly.

Q   Okay.

A   I would just pay for my own ticket and just fly back.

Q   But it sounds like at that point you had already decided that you likely would not be returning?

A   Oh, no.  I was not going to go back at all.